*359 Justice Stevens
delivered the opinion of the Court.
Article I, § 8, cl. 4, of the Constitution provides that Congress shall have the power to establish “uniform Laws on the subject of Bankruptcies throughout the United States.” In Tennessee Student Assistance Corporation v. Hood, 541 U. S. 440 (2004), we granted certiorari to determine whether this Clause gives Congress the authority to abrogate States’ immunity from private suits. See id., at 443. Without reaching that question, we upheld the application of the Bankruptcy Code to proceedings initiated by a debtor against a state agency to determine the dischargeability of a student loan debt. See id., at 451. In this case we consider whether a proceeding initiated by a bankruptcy trustee to set aside preferential transfers by the debtor to state agencies is barred by sovereign immunity. Relying in part on our reasoning in Hood, we reject the sovereign immunity defense advanced by the state agencies.
*360 I
Petitioners are Virginia institutions of higher education that are considered “arm[s] of the State” entitled to sovereign immunity. See, e. g., Alden v. Maine, 527 U. S. 706, 756 (1999) (observing that only arms of the State can assert the State’s immunity). Wallace’s Bookstores, Inc., did business with petitioners before it filed a petition for relief under chapter 11 of the Bankruptcy Code, 11 U. S. C. § 101 et seq. (2000 ed. and Supp. III), in the United States Bankruptcy Court for the Eastern District of Kentucky. Respondent, Bernard Katz, is the court-appointed liquidating supervisor of the bankrupt estate. He has commenced proceedings in the Bankruptcy Court pursuant to §§ 547(b) and 550(a) to avoid and recover alleged preferential transfers to each of the petitioners made by the debtor when it was insolvent.[1] Petitioners’ motions to dismiss those proceedings on the basis of sovereign immunity were denied by the Bankruptcy Court.
*361 The denial was affirmed by the District Court and the Court of Appeals for the Sixth Circuit, judgt. order reported at 106 Fed. Appx. 841 (2004), on the authority of the Sixth Circuit’s prior determination that Congress has abrogated the States’ sovereign immunity in bankruptcy proceedings. See Hood v. Tennessee Student Assistance Corporation, 319 F. 3d 755 (2003). We granted certiorari, 544 U. S. 960 (2005), to consider the question left open by our opinion in Hood: whether Congress’ attempt to abrogate state sovereign immunity in 11 U. S. C. § 106(a)[2] is valid. As *362 we shall explain, however, we are persuaded that the enactment of that provision was not necessary to authorize the Bankruptcy Court’s jurisdiction over these preference avoidance proceedings.
Bankruptcy jurisdiction, at its core, is in rem. See Gardner v. New Jersey, 329 U. S. 565, 574 (1947) (“The whole process of proof, allowance, and distribution is, shortly speaking, an adjudication of interests claimed in a res”). As we noted in Hood, it does not implicate States’ sovereignty to nearly the same degree as other kinds of jurisdiction. See 541 U. S., at 450-451 (citing admiralty and bankruptcy cases). That was as true in the 18th century as it is today. Then, as now, the jurisdiction of courts adjudicating rights in the bankrupt estate included the power to issue compulsory orders to facilitate the administration and distribution of the res.
It is appropriate to presume that the Framers of the Constitution were familiar with the contemporary legal context when they adopted the Bankruptcy Clause[3] — a provision which, as we explain in Part IV, infra, reflects the States’ acquiescénce in a grant of congressional power to subordinate to the pressing goal of harmonizing bankruptcy law sovereign immunity defenses that might have been asserted in bankruptcy proceedings. The history of the Bankruptcy Clause, the reasons it was inserted in the Constitution, and *363 the legislation both proposed and enacted under its auspices immediately following ratification of the Constitution demonstrate that it was intended not just as a grant of legislative authority to Congress, but also to authorize limited subordination of state sovereign immunity in the bankruptcy arena. Foremost on the minds of those who adopted the Clause were the intractable problems, not to mention the injustice, created by one State’s imprisoning of debtors who had been discharged (from prison and of their debts) in and by another State. As discussed below, to remedy this problem, the very first Congresses considered, and the Sixth Congress enacted, bankruptcy legislation authorizing federal courts to, among other things, issue writs of habeas corpus directed at state officials ordering the release of debtors from state prisons.
We acknowledge that statements in both the majority and the dissenting opinions in Seminole Tribe of Fla. v. Florida, 517 U. S. 44 (1996), reflected an assumption that the holding in that case would apply to the Bankruptcy Clause. See also Hoffman v. Connecticut Dept. of Income Maintenance, 492 U. S. 96, 105 (1989) (O’Connor, J., concurring). Careful study and reflection have convinced us, however, that that assumption was erroneous. For the reasons stated by Chief Justice Marshall in Cohens v. Virginia, 6 Wheat. 264 (1821), we are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated. See id., at 399-400 (“It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision”).
II
Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor’s *364 property, the equitable distribution of that property among the debtor’s creditors, and the ultimate discharge that gives the debtor a “fresh start” by releasing him, her, or it from further liability for old debts. See, e. g., Local Loan Co. v. Hunt, 292 U. S. 234, 244 (1934). “Under our longstanding precedent, States, whether or not they choose to participate in the proceeding, are bound by a bankruptcy court’s discharge order no less than other creditors.” Hood, 541 U. S., at 448. Petitioners here, like the state agencies that were parties in Hood, have conceded as much. See id., at 449 (noting concession that “States are generally bound by a bankruptcy court’s discharge order”); Tr. of Oral Arg. 8-9.
The history of discharges in bankruptcy proceedings demonstrates that the state agencies’ concessions, and Hood’s holding, are correct. The term “discharge” historically had a dual meaning; it referred to both release of debts and release of the debtor\from prison. Indeed, the earliest English statutes governing bankruptcy and insolvency authorized discharges of persons, not debts. One statute enacted in 1649 was entitled “An Act for discharging Poor Prisoners unable to satisfie their Creditors.” 2 Acts and Ordinances of the Interregnum, 1642-1660, pp. 240-241 (C. Firth & R. Rait eds. 1911). The stated purpose of the Act was to “Discharge . . . the person of [the] Debtor” “of and from his or her Imprisonment.” Ibid. Not until 1705 did the English Parliament extend the discharge (and then only for traders and merchants) to include release of debts. See 4 Ann., ch. 17, §7,11 Statutes at Large 165 (D. Pickering ed. 1764) (providing that upon compliance with the statute, “all and every person and persons so becoming bankrupt... shall be discharged from all debts by him, her, or them due and owing at the time that he, she, or they did become bankrupt”); see also McCoid, Discharge: The Most Important Development in Bankruptcy History, 70 Am. Bankr. L. J. 163, 167 (1996).
*365 Well into the 18th century, imprisonment for debt was still ubiquitous in England[4] and the American Colonies. Bankruptcy and insolvency laws remained as much concerned with ensuring full satisfaction of creditors (and, relatedly, preventing debtors’ flight to parts unknown[5]) as with securing new beginnings for debtors. Illustrative of bankruptcy laws’ harsh treatment of debtors during this period was that debtors often fared worse than common criminals in prison; unfortunate insolvents, unlike criminals, were forced to provide their own food, fuel, and clothing while behind bars. See B. Mann, Republic of Debtors: Bankruptcy in the Age of American Independence 78-108 (2002).
Common as imprisonment itself was, the American Colonies, and later the several States, had wildly divergent schemes for discharging debtors and their debts. Id., at 79 (“The only consistency among debt laws in the eighteenth century was that every colony, and later every state, permitted imprisonment for debt — most on mesne process, and all on execution of a judgment”). At least four jurisdictions offered relief through private Acts of their legislatures. See Railway Labor Executives’ Assn. v. Gibbons, 455 U. S. 457, 472 (1982). Those Acts released debtors from prison upon surrender of their property, and many coupled the release from prison with a discharge of debts. Other jurisdictions enacted general laws providing for release from prison and, in a few places, discharge of debt. Others still granted re *366 lease from prison, but only in exchange for indentured servitude. Some jurisdictions provided no relief at all for the debtor. See generally P. Coleman, Debtors and Creditors in America: Insolvency, Imprisonment for Debt, and Bankruptcy, 1607-1900 (1999).[6]
The difficulties posed by this patchwork of insolvency and bankruptcy laws were peculiar to the American experience. In England, where there was only one sovereign, a single discharge could protect the debtor from his jailer and his creditors. As two cases — one litigated before the Constitutional Convention in Philadelphia and one litigated after it— demonstrate, however, the uncoordinated actions of multiple sovereigns, each laying claim to the debtor’s body and effects according to different rules, rendered impossible so neat a solution on this side of the Atlantic.
In the first case, James v. Allen, 1 Dall. 188 (C. P. Phila. Cty. 1786), Jared Ingersoll, an attorney who a year later would become a delegate to the Philadelphia Convention,[7] represented a Pennsylvania creditor seeking recovery from a debtor who had been released from prison in New Jersey. Shortly after his release, the debtor traveled to Pennsylvania, where he was arrested for nonpayment of the Pennsylva *367 nia debt. In seeking release from the Pennsylvania prison, he argued that his debt had been discharged by the New Jersey court. Ingersoll responded that the order granting relief under New Jersey’s insolvency laws “only discharged the person of the debtor from arrest within the State of New Jersey.” Id., at 190. The court agreed: Whatever effect the order might have had in New Jersey, the court said, it “goes no further than to discharge [the debtor] from his imprisonment in the Gaol of Essex County in the State of New Jersey; which, if the fullest obedience were paid to it, could not authorize a subsequent discharge from imprisonment in another Gaol, in another State.” Id., at 192. The court further observed that “[insolvent laws subsist in every State in the Union, and are probably all different from each other .... Even the Bankrupt Laws of England, while we were the subjects of that country, were never supposed to extend here, so as to exempt the persons of the Bankrupts from being arrested.” Id., at 191.
In the second case, Millar v. Hall, 1 Dall. 229 (Pa. 1788), which was decided the year after the Philadelphia Convention, Ingersoll found himself arguing against the principle announced in James. His client, a debtor named Hall, had been “discharged under an insolvent law of the state of Maryland, which is in the nature of a general bankrupt[cy] law.” 1 Dall., at 231. Prior to his discharge, Hall had incurred a debt to a Pennsylvanian named Millar. Hall neglected to mention that debt in his schedule of creditors presented to the Maryland court, or to personally notify Millar of the looming discharge. Following the Maryland court’s order, Hall traveled to Pennsylvania and was promptly arrested for the unpaid debt to Millar.
Responding to Millar’s counsel’s argument that the holding of James controlled, Ingersoll urged adoption of a rule that “the discharge of the Defendant in one state ought to be sufficient to discharge [a debtor] in every state.” 1 Dall., at 231. Absent such a rule, Ingersoll continued, “perpetual *368 imprisonment must be the lot of every man who fails; and all hope of retrieving his losses by honest and industrious pursuits, will be cut off from the unfortunate bankrupt.” Ibid. The court accepted this argument. Allowing a creditor to execute “upon [a debtor’s] person out of the state in which he has been discharged,” the court explained, “would be giving a superiority to some creditors, and affording them a double satisfaction — to wit, a proportionable dividend of his property there, and the imprisonment of his person here.” Id., at 232. Indeed, the debtor having already been obliged to surrender all of his effects, “to permit the taking [of] his person here, would be to attempt to compel him to perform an impossibility, that is, to pay a debt after he has been deprived of every means of payment, — an attempt which would, at least, amount to perpetual imprisonment, unless the benevolence of his friends should interfere to discharge [his] account.” Ibid.
These two cases illustrate the backdrop against which the Bankruptcy Clause was adopted. In both James and Millar, the debtors argued that the earlier discharge should be given preclusive effect pursuant to the Full Faith and Credit Clause of the Articles of Confederation. See James, 1 Dall., at 190; Millar, 1 Dall., at 231. That possibility was the subject of discussion at the Constitutional Convention when a proposal to encompass legislative Acts, and insolvency laws in particular, within the coverage of the Full Faith and Credit Clause of the Constitution was committed to the Committee of Detail[8] together with a proposal “‘[t]o establish uniform laws lipón the subject of bankruptcies, and respecting the damages arising on the protest of foreign bills of exchange.’” See Nadelmann, On the Origin of the Bankruptcy Clause, 1 Am. J. Legal Hist. 215, 216-217, 219 (1957); see also Plank, The Constitutional Limits of Bankruptcy, 63 *369 Term. L. Rev. 487, 527-528 (1996). A few days after this proposal was taken under advisement, the Committee of Detail reported that it had recommended adding the power “ ‘[t]o establish uniform laws upon the subject of bankruptcies’” to the Naturalization Clause of what later became Article I. Id., at 527.
The Convention adopted the Committee’s recommendation with very little debate two days later. Roger Sherman of Connecticut alone voted against it, apparently because he was concerned that it would authorize Congress to impose upon American citizens the ultimate penalty for debt then in effect in England: death. See J. Madison, Notes of Debates in the Federal Convention of 1787, p. 571 (Ohio Univ. Press ed. 1966). The absence of extensive debate over the text of the Bankruptcy Clause or its insertion indicates that there was general agreement on the importance of authorizing a uniform federal response to the problems presented in cases like James and Millar.[9]
Ill
Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally in rem jurisdiction. See Hood, 541 U. S., at 447; Local Loan Co., 292 U. S., at 241; Straton v. New, 283 U. S. 318, 320-321 (1931); Hanover Nat. *370 Bank v. Moyses, 186 U. S. 181, 192 (1902); New Lamp Chimney Co. v. Ansonia Brass & Copper Co., 91 U. S. 656, 661-662 (1876). In bankruptcy, “the court’s jurisdiction is premised on the debtor and his estate, and not on the creditors.” Hood, 541 U. S., at 447. As such, its exercise does not, in the usual case, interfere with state sovereignty even when States’ interests are affected. See id., at 448.
The text of Article I, § 8, cl. 4, of the Constitution, however, provides that Congress shall have the power to establish “uniform Laws on the subject of Bankruptcies throughout the United States.” Although the interest in avoiding unjust imprisonment for debt and making federal discharges in bankruptcy enforceable in every State was a primary motivation for the adoption of that provision, its coverage encompasses the entire “subject of Bankruptcies.” The power granted to Congress by that Clause is a unitary concept rather than an amalgam of discrete segments.
The Framers would have understood that laws “on the subject of Bankruptcies” included laws providing, in certain limited respects, for more than simple adjudications of rights in the res. The first bankruptcy statute, for example, gave bankruptcy commissioners appointed by the district court the power, inter alia, to imprison recalcitrant third parties in possession of the estate’s assets. See Bankruptcy Act of 1800, § 14,2 Stat. 25 (repealed 1803). More generally, courts adjudicating disputes concerning bankrupts’ estates historically have had the power to issue ancillary orders enforcing their in rem adjudications. See, e. g., 2 W. Blackstone, Commentaries on the Laws of England 486 (1766) (noting that the assignees of the bankrupt’s property — the 18th-century counterparts to today’s bankruptcy trustees — could “pursue any legal method of recovering [the debtor’s] property so vested in them,” and could pursue methods in equity with the consent of the creditors); Plank, 63 Tenn. L. Rev., at 523 (discussing state insolvency and bankruptcy laws in the 18th century empowering courts to recover preferential trans *371 fers); see also Ex parte Christy, 3 How. 292, 312, 314 (1844) (opinion for the Court by Story, J.) (describing bankruptcy jurisdiction under the 1841 Act in broad terms); Wright v. Union Central Life Ins. Co., 304 U. S. 502, 513-514 (1938) (defining “bankruptcy” as the “ ‘subject of the relations between an insolvent or nonpaying or fraudulent debtor and his creditors, extending to his and their relief ’ ” (emphasis added)).
Our decision in Hood illustrates the point. As the dissenters in that case pointed out, it was at least arguable that the particular procedure that the debtor pursued to establish dischargeability of her student loan could have been characterized as a suit against the State rather than a purely in rem proceeding. See 541 U. S., at 455-456 (Thomas, J., dissenting). But because the proceeding was merely ancillary to the Bankruptcy Court’s exercise of its in rem jurisdiction, we held that it did not implicate state sovereign immunity. The point is also illustrated by Congress’ early grant to federal courts of the power to issue in personam writs of habeas corpus directing States to release debtors from state prisons, discussed in Part IV, infra. See Braden v. 30th Judicial Circuit Court of Ky., 410 U. S. 484, 494-495 (1973) (“The writ of habeas corpus does not act upon the prisoner who seeks relief, but upon the person who holds him in what is alleged to be unlawful custody”).
The interplay between in rem adjudications and orders ancillary thereto is evident in the ease before us. Respondent first seeks a determination under 11 U. S. C. §547 that the various transfers made by the debtor to petitioners qualify as voidable preferences. The § 547 determination, standing alone, operates as a mere declaration of avoidance. That declaration may be all that the trustee wants; for example, if the State has a claim against the bankrupt estate, the avoidance determination operates to bar that claim until the preference is turned over. See § 502(d). In some cases, though, the trustee, in order to marshal the entirety of the *372 debtor’s estate, will need to recover the subject of the transfer pursuánt to § 550(a). A court order mandating turnover of the property, although ancillary to and in furtherance of the court’s in rem jurisdiction, might itself involve in perso-nam process.
As we explain in Part IV, infra, it is not necessary to decide whether actions to recover preferential transfers pursuant to § 550(a) are themselves properly characterized as in rem.[10] Whatever the appropriate appellation, those who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid preferential transfers and to recover the transferred property. Petitioners do not dispute that that authority has been a core aspect of the administration of bankrupt estates since at least the 18th century. See, e. g., Rust v. Cooper, 2 Cowp. 629, 633-634, 98 Eng. Rep. 1277, 1280 (K. B. 1777); Alderson v. Temple, 1 Black. W. 660, 661-663, 96 Eng. Rep. 384, 385 *373 (K. B. 1768); see also McCoid, Bankruptcy, Preferences, and Efficiency: An Expression of Doubt, 67 Va. L. Rev. 249, 251-253 (1981) (discussing-English precedents, dating back to Sir Edward Coke’s discussion in The Case of Bankrupts, 2 Co. Rep. 25a, 76 Eng. Rep. 441 (K. B. 1584), addressing bankruptcy commissioners’ power to avoid preferences); In re Dehon, Inc., 327 B. R. 38,62-65 (Bkrtcy. Ct. Mass. 2005) (collecting historical materials). And it, like the authority to issue writs of habeas corpus releasing debtors from state prisons, see Part IV, infra, operates free and clear of the State’s claim of sovereign immunity.
IV
Insofar as orders ancillary to the bankruptcy courts in rem jurisdiction, like orders directing turnover of preferential transfers, implicate States’ sovereign immunity from suit, the States agreed in the plan of the Convention not to assert that immunity. So much is evidenced not only by the history of the Bankruptcy Clause, which shows that the Framers’ primary goal was to prevent competing sovereigns’ interference with the debtor’s discharge, see Part II, supra, but also by legislation considered and enacted in the immediate wake of the Constitution’s ratification.
Congress considered proposed legislation establishing uniform federal bankruptcy laws in the first and each succeeding Congress until 1800, when the first Bankruptcy Act was passed. See C. Warren, Bankruptcy in United States History 10 (1935) (“[I]n the very first session of the 1st Congress, during which only the most necessary subjects of legislation were considered, bankruptcy was one of those subjects; and as early as June 1, 1789, a Committee of the House was named to prepare a bankruptcy bill”). The Bankruptcy Act of 1800 was in many respects a copy of the English bankruptcy statute then in force. It was, like the English law, chiefly a measure designed to benefit creditors. Like the English statute, its principal provisions permitted *374 bankruptcy commissioners, on appointment by a federal district court, to arrest the debtor, see § 4, 2 Stat. 22; to “cause the doors of the dwelling-house of [the] bankrupt to be broken,” § 4, id., at 22-23; to seize and collect the debtor’s assets, § 5, id., at 23; to examine the debtor and any individuals who might have possession of the debtor’s property, §§ 14,18,19, id., at 25-27; and to issue a “certificate of discharge” once the estate had been distributed, §36, id., at 31.
The American legislation differed slightly from the English, however. That difference reflects both the uniqueness of a system involving multiple sovereigns and the concerns that lay at the core of the Bankruptcy Clause itself. The English statute gave a judge sitting on a court where the debtor had obtained his discharge the power to order a sheriff, “Bailiff or Officer, Gaoler or Keeper of any Prison” to release the “Bankrupt out of Custody” if he were arrested subsequent to the discharge. 5 Geo. 2, ch. 30, ¶ 13 (1732). The American version of this provision was worded differently; it specifically granted federal courts the authority to issue writs of habeas corpus effective to release debtors from state prisons. See § 38, 2 Stat. 32; see also In re Comstock, 6 F. Cas. 237, 239 (No. 3,073) (Vt. 1842) (observing that Bankruptcy Act of 1800, then repealed, would have granted a federal court the power to issue a writ of habeas corpus to release a debtor from state prison if he had been arrested following his bankruptcy discharge).
This grant of habeas power is remarkable not least because it would be another 67 years, after Congress passed the Fourteenth Amendment, before the writ would be made generally available to state prisoners. See Ex parte Royall, 117 U. S. 241, 247 (1886).[11] Moreover, the provision of the *375 1800 Act granting that power was considered and adopted during a period when state sovereign immunity could hardly have been more prominent among the Nation’s concerns. Chisholm v. Georgia, 2 Dall. 419, the case that had so “shock[ed]” the country in its lack of regard for state sovereign immunity, Principality of Monaco v. Mississippi, 292 U. S. 313, 325 (1934), was decided in 1793. The ensuing five years that culminated in adoption of the Eleventh Amendment were rife with discussion of States’ sovereignty and their amenability to suit. Yet there appears to be no record of any objection to the bankruptcy legislation or its grant of habeas power to federal courts based on an infringement of sovereign immunity. See Haines 184-185.
This history strongly supports the view that the Bankruptcy Clause of Article I, the source of Congress’ authority to effect this intrusion upon state sovereignty, simply did not contravene the norms this Court has understood the Eleventh Amendment to exemplify. Cf. Blatchford v. Native Village of Noatak, 501 U. S. 775, 779 (1991) (“[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition of our constitutional structure which it confirms . . . ”).[12] Petitioners, ignoring *376 this history, contend that nothing in the words of the Bankruptcy Clause evinces an intent on the part of the Framers to alter the “background principle” of state sovereign immunity. Seminole Tribe of Fla., 517 U. S., at 72. Specifically, they deny that the word “uniform” in the Clause implies anything about pre-existing immunities or Congress’ power to interfere with those immunities. See Brief for Petitioners 32-42. Whatever the merits of petitioners’ argument,[13] it *377 misses the point; text aside, the Framers, in adopting the Bankruptcy Clause, plainly intended to give Congress the power to redress the rampant injustice resulting from States’ refusal to respect one another’s discharge orders. As demonstrated by the First Congress’ immediate consideration and the Sixth Congress’ enactment of a provision granting federal courts the authority to release debtors from state prisons, the power to enact bankruptcy legislation was understood to carry with it the power to subordinate state sovereignty, albeit within a limited sphere.
The ineluctable conclusion, then, is that States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to “Laws on the subject of Bankruptcies.” See Blatchford, 501 U. S., at 779 (observing that a State is not “subject to suit in federal court unless it has consented to suit, either expressly or in the ‘plan of the convention’”); *378 Alden v. Maine, 527 U. S., at 713 (same).[14] The scope of this consent was limited; the jurisdiction exercised in bankruptcy proceedings was chiefly in rem — a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdiction. But while the principal focus of the bankruptcy proceedings is and was always the res, some exercises of bankruptcy courts’ powers — issuance of writs of habeas corpus included — unquestionably involved more than mere adjudication of rights in a res. In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts.[15]
Y
Neither our decision in Hood, which held that States could not assert sovereign immunity as a defense in adversary proceedings brought to adjudicate the dischargeability of student loans, nor the cases upon which it relied, see 541 U. S., at 448-449 (discussing New York v. Irving Trust Co., 288 U. S. 329 (1933); Gardner, 329 U. S. 565; and Van Huffel v. Harkelrode, 284 U. S. 225 (1931)), rested on any statement Congress had made on the subject of state sovereign immu *379 nity. Nor does our decision today. The relevant question is not whether Congress has “abrogated” States’ immunity in proceedings to recover preferential transfers. See 11 U. S. C. § 106(a).[16] The question, rather, is whether Congress’ determination that States should be amenable to such proceedings is within the scope of its power to enact “Laws on the subject of Bankruptcies.” We think it beyond peradventure that it is.
Congress may, at its option, either treat States in the same way as other creditors insofar as concerns “Laws on the subject of Bankruptcies” or exempt them from operation of such laws. Its power to do so arises from the Bankruptcy Clause itself; the relevant “abrogation” is the one effected in the plan of the Convention, not by statute.
The judgment of the Court of Appeals for the Sixth Circuit is affirmed.

It is so ordered.

 A preferential transfer is defined as “any transfer of an interest of the debtor in property— '
“(1) to or for the benefit of a creditor;
“(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
“(3) made while the debtor was insolvent;
“(4) made—
“(A) on or within 90 days before the date of the filing of the petition; ór
“(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
“(5) that enables such creditor to receive more than such creditor would receive if—
“(A) the case were a case under chapter 7 of this title;
“(B) the transfer had not been made; and
“(C) such creditor received payment of such debt to the extent provided by the provisions of this title.” 11 U. S. C. § 547(b).
Respondent also instituted adversary proceedings against some of the petitioners to collect accounts receivable. He has, however, filed a letter with this Court indicating his intent not to pursue those claims further.

 Section 106(a), as amended in 1994, provides in part as follows:
“Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit . . . with respect to the following:
“(1) Sections 105,106,107,108, 303,346,362,363,364, 365,366,502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143,1146,1201, 1203, 1205,1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.
“(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.
“(3) The court may issue against a governmental unit an order, process, or judgment under such sections of the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages....”
The term “governmental unit” is defined to include a “State,” a “municipality,” and a “department, agency, or instrumentality of ... a State.” §101(27).
The above-quoted version of § 106(a) is the product of revisions made in the wake of some of our precedents. The Bankruptcy Reform Act of 1978, 92 Stat. 2549, contained a provision indicating only that “governmental unit[s],” defined to include States, were deemed to have “waived sovereign immunity” with respect to certain proceedings in bankruptcy and to be bound by a court’s determinations under certain provisions of the Act “notwithstanding any assertion of sovereign immunity.” Id., at 2555-2556. This Court’s decisions in Hoffman v. Connecticut Dept, of Income Maintenance, 492 U. S. 96 (1989), and United States v. Nordic Village, Inc., 503 U. S. 30 (1992), which held that Congress had failed to make sufficiently clear in the predecessor to § 106(a) its intent either to “abrogate” state sovereign immunity or to waive the Federal Government’s *362 immunity, see 492 U. S., at 101; 503 U. S., at 39, prompted Congress in 1994 to enact the text of § 106(a) now in force. See generally Gibson, Congressional Response to Hoffman and Nordic Village: Amended Section 106 and Sovereign Immunity, 69 Am. Bankr. L. J. 311 (1995).

 In Cannon v. University of Chicago, 441 U. S. 677, 699 (1979), we endorsed the presumption “that Congress was thoroughly familiar” with contemporary law when it enacted Title IX of the Civil Rights Act of 1964. It is equally proper to presume that the delegates to the Constitutional Convention were fully aware of the potential for injustice, discussed in Part II, infra, presented by the nonuniform state laws authorizing imprisonment as a remedy for the nonpayment of an insolvent’s debts.

 Imprisonment for debt was not abolished in England until 1869, and then only subject to certain exceptions. See Debtors Act, 1869, 32 & 33 Vict., ch. 62, §4; see also Cohen, The History of Imprisonment for Debt and its Relation to the Development of Discharge in Bankruptcy, 3 J. Legal Hist. 153,164 (1982).

 The legislation widely acknowledged to be the first English bankruptcy statute, 34 & 35 Hen. 8, ch. 4, § 1 (1542), contained a provision explaining that the statute was needed to deal with the growing number of debtors who, after “craftily obtaining into their Hands great Substance of other Mens [sic] Goods, do suddenly flee to Parts unknown.”

 “At the time of the Revolution, only three of the thirteen colonies ... had laws discharging insolvents of their debts. No two of these relief systems were alike in anything but spirit. In four of the other ten colonies, insolvency legislation was either never enacted or, if enacted, never went into effect, and in the remaining six colonies, full relief was available only for scattered, brief periods, usually on an ad hoc basis to named insolvents.” Coleman, Debtors and Creditors in America, at 14.

 Ingersoll was admitted to the Philadelphia bar in. 1773 and elected a member of the Continental Congress in 1780. After serving as a delegate to the Constitutional Convention, he became a member of the Philadelphia Common Council. He served, as attorney general of Pennsylvania from 1790 to 1799 and again from 1811 to 1817. From March 1821 until his death in 1822 he served as a judge in the District Court for the City and County of Philadelphia. Among the cases he litigated before this Court was Chisholm v. Georgia, 2 Dall. 419 (1793) — for the State of Georgia, see ibid. See also 9 Dictionary of American Biography 468-469 (1932).

 The Committee of Detail was created by the Convention on July 25, 1787, to prepare a draft text of the Constitution based on delegates’ proposals.

 Of course, the Bankruptcy Clause, located as it is in Article I, is “ ‘intimately connected’ ” not just with the Full Faith and Credit Clause, which appears in Article IV of the Constitution, but also with the Commerce Clause. See Railway Labor Executives’ Assn. v. Gibbons, 455 U. S. 457, 466 (1982) (quoting The Federalist No. 42, p. 285 (N. Y. Heritage Press 1945)). That does not mean, however, that the state sovereign immunity implications of the Bankruptcy Clause necessarily mirror those of the Commerce Clause. Indeed, the Bankruptcy Clause’s unique history, combined with the singular nature of bankruptcy courts’ jurisdiction, discussed infra, have persuaded .us that the ratification of the Bankruptcy Clause does represent a surrender by the States of their sovereign immunity in certain federal proceedings. That conclusion is implicit in our holding in Tennessee Student Assistance Corporation v. Hood, 541 U. S. 440 (2004).

 The proper characterization of such actions is not as clear as petitioners suggest. The Court in Nordic Village, Inc., 503 U. S., at 38, stated, as an alternative basis for rejecting a bankruptcy trustee’s argument that a suit to avoid a preferential transfer made to the Internal Revenue Service was an action in rem, that any in rem “exception” to sovereign immunity was unavailable in that case because the trustee sought to recover a “sum of money, not ‘particular dollars.'” There was, in the Court’s view, “no res to which the [bankruptcy] court’s in rem jurisdiction could have attached.” Ibid. In making that determination, the Court distinguished our earlier decision in United States v. Whiting Pools, Inc., 462 U. S. 198 (1983), which held that the debtor’s “estate,” the res, “includes property of the debtor that has been seized by a creditor prior to the filing of a [bankruptcy] petition.” Id., at 209; see also Begier v. IRS, 496 U. S. 53, 58 (1990) (“‘property of the debtor’ subject to the preferential transfer provision is best understood as that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings”). We observe that the trustee in this case, unlike the one in Nordic Village, seeks, in the alternative, both return of the “value” of the preference, see 11 U. S. C. § 550(a), and return of the actual “property transferred,” ibid. See Brief for Respondent 37 (“Respondent invokes the in rem jurisdiction of the bankruptcy court to recover under section 550 ‘the property transferred’ ”).

 The Judiciary Act of 1789 authorized issuance of the writ, but only to release those held in federal custody. See Haines, The Uniformity Power: Why Bankruptcy is Different, 77 Am. Bankr. L. J. 129, 179-181 (2003) (hereinafter Haines). Also, in the interim between 1800 and 1867, Congress authorized limited issuance of the writ in response to two crises it *375 viewed as sufficiently pressing to warrant a federal response: the South Carolina nullification controversy of 1828-1833 and the imprisonment of a foreign national by New York. State a few years later. See 4 Stat. 632 (1833); 5 Stat. 539 (1842); see also W. Duker, A Constitutional History of Habeas Corpus 187-189 (1980). The 1833 statute made the writ available to U. S. citizens imprisoned by States for actions authorized by federal law, while the 1842 statute gave federal judges the power to release foreign nationals imprisoned for actions authorized by foreign governments.

 Further evidence of the Framers’ intent to exempt laws “on the subject of Bankruptcies” from the operation of state sovereign immunity principles can be gleaned from §62 of the Bankruptcy Act of 1800. That section provided that “nothing contained in this law shall, in any manner, effect the right of preference to prior satisfaction of debts due to the United States as secured or provided by any law heretofore passed, nor shall be construed to lessen or impair any right to, or security for, money due to the United States or to any of them.” 2 Stat. 36. That Congress *376 felt the need to carve out an exception for States’ preferences undermines any suggestion that it was operating against a background presumption of state sovereign immunity to bankruptcy laws. Indeed, one contemporary commentator read this section of the Act as requiring that the protected “priorit[ies]” would have tó be “specifically given by some act of the Legislature of the Union” before they would be exempt from operation of the Act’s provisions. T. Cooper, The Bankrupt Law of America, Compared with the Bankrupt Law of England 334 (1801) (reprint 1993) (“But I do not apprehend [that] this extends to give any priority to the United States, not specifically given by. some act of the Legislature of the Union; nor will the English doctrine of priorities in favour of the crown be extended by analogy into this country”).

 Petitioners make much of precedents suggesting that the word “uniform” represents a limitation, rather than an expansion, of Congress’ legislative power in the bankruptcy sphere. See, e. g., Gibbons, 455 U. S., at 468 (“Unlike the Commerce Clause, the Bankruptcy Clause itself contains an affirmative limitation or restriction upon Congress’ power: bankruptcy laws must be uniform throughout the United States”). They also cite Justice Frankfurter’s concurring opinion in Vanston Bondholders Protective Comm. v. Green, 329 U. S. 156 (1946), for the proposition that “[t]he Constitutional requirement of uniformity is a requirement of geographic uniformity,” id., at 172. Based on these authorities, petitioners argue that the word “uniform” in the Bankruptcy Clause cannot be interpreted to confer upon Congress any greater authority to impinge upon state sovereign immunity than is conferred, for example, by the Commerce Clause. See Brief for Petitioners 33.
Petitioners’ logic is not persuasive. Although our analysis does not rest on the peculiar text of the Bankruptcy Clause as compared to other Clauses of Article I, we observe that, if anything, the mandate to enact “uniform” laws supports the historical evidence showing that the States agreed not to assert their sovereign immunity in proceedings brought pur *377 suant to “Laws on the subject of Bankruptcies.” That Congress is constrained to enact laws that are uniform in application, whether geographically or otherwise, cf. Gibbons, 455 U. S., at 470 (invalidating a bankruptcy law aimed at “one regional bankrupt railroad” and no one else), does not imply that it lacks power to enact bankruptcy legislation that is uniform in a more robust sense. See Haines 158-172. As our holding today demonstrates, Congress has the power to enact bankruptcy laws the purpose and effect of which are to ensure uniformity in treatment of state and private creditors. See Sturges v. Crowninshield, 4 Wheat. 122, 193-194 (1819) (opinion for the Court by Marshall, C. J.) (“The peculiar terms of the grant certainly deserve notice. Congress is not authorized merely to pass laws, the operation of which shall be uniform, but to establish uniform laws on the subject throughout the United States”); see also In re Dehon, Inc., 327 B. R. 38, 57-58 (Bkrtcy. Ct. Mass. 2005) (discussing Lathrop v. Drake, 91 U. S. 516 (1876)); The Federalist Nos. 32 and 81, pp. 197-201, 481-491 (C. Rossiter ed. 1961) (A. Hamilton) (pointing to the “uniformity]” language of the Naturalization Clause, which appears in the same clause of Article I as the bankruptcy provision, as an example of an instance where the Framers contemplated a “surrender of [States’] immunity in the plan of the convention”).

 One might object that the writ of habeas corpus was no infringement on state sovereignty, and would not have been understood as such, because that writ, being in the nature of an injunction against a state official, does not commence or constitute a suit against the State. See Ex parte Young, 209 U. S. 123, 159-160 (1908). While that objection would be supported by precedent today, it would not have been apparent to the Framers. The Ex parte Young doctrine was not finally settled until over a century after the framing and the enactment of the first bankruptcy statute. Indeed, we have recently characterized the doctrine as an expedient '‘fiction” necessary to ensure the supremacy of federal law. See Pennhurst State School and Hospital v. Halderman, 465 U. S. 89, 114, n. 25 (1984); see also Idaho v. Coeur d’Alene Tribe of Idaho, 521 U. S. 261, 281 (1997).

 We do not mean to suggest that every law labeled a “bankruptcy” law could, consistent with the Bankruptcy Clause, properly impinge upon state sovereign immunity.

 Cf. Hoffman, 492 U. S., at 101 (holding that, in an earlier version of 11 U. S. C. § 106, Congress had failed to make sufficiently clear its intent to abrogate state sovereign immunity).