In re Betty A. WALLACE, Debtor.

No. HK 05–20209.

United States Bankruptcy Court,
W.D. Michigan.

Aug. 9, 2006.

Joseph C. McCully, Esq., Kalamazoo, MI, for Debtor.

Scott A. Chernich, Esq., Lansing, MI, Chapter 7 Trustee.

### OPINION RE: TRUSTEE'S FEBRUARY 1, 2006 OBJECTION TO AMENDED EXEMPTIONS

JEFFREY R. HUGHES, Bankruptcy Judge.

Betty A. Wallace ("Debtor") filed a petition for relief under Chapter 7 of the Bankruptcy Code[1] on October 15, 2005. Debtor's Schedule A indicates that she owns an undivided one-half interest in real property located in Battle Creek, Michigan. That interest became property of the estate upon the filing of her petition. 11 U.S.C. § 541(a)(1).

Debtor has claimed her interest in the Battle Creek property as exempt. The basis for her claimed exemption is MICH. COMP. LAWS § 600.5451(1)(n). *See also,* 11 U.S.C. § 522(b)(2). The value of the exemption claimed is $30,000.00.[2]

The Chapter 7 Trustee filed a timely objection to Debtor's claimed exemption. He contends that MICH. COMP. LAWS § 600.5451(1)(n) is unconstitutional because it violates the Supremacy Clause. U.S. CONST., art. VI, cl. 2.

### DISCUSSION

Art. I, Section 8, Clause 4 of the United States Constitution empowers Congress "[t]o establish … uniform Laws on the subject of Bankruptcies." Consequently, the Bankruptcy Code and its predecessors represent "the supreme Law of the Land." U.S. CONST. art. VI, cl. 2. Individual states may not enact alternative bankruptcy codes. Nor may the individual states pass laws that either interfere with or complement the bankruptcy laws Congress has enacted.

A state is without power to make or enforce any law governing bankruptcies that impairs the obligation of contracts or extends to persons or property out-

1. 11 U.S.C. §§ 101, *et seq.* Debtor's petition pre-dates the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, § 1501(B)(1), 119 Stat. 23. Unless otherwise indicated, all citations in this opinion to the Bankruptcy Code will be to the Bankruptcy Code as written prior to the BAPCPA amendments.

2. Debtor's Schedule C. Debtor has stated that the current market value of the Battle Creek property is $58,000.00. Debtor's Schedules A and C. It is unclear whether this amount represents the current market value of only Debtor's undivided one-half interest or whether it represents the current market value of both undivided interests.

side its jurisdiction or **conflicts with the national bankruptcy laws**.

\* \* \* \* \* \*

Congress did not intend to give insolvent debtors seeking discharge, or their creditors seeking to collect claims, choice between the relief provided by the Bankruptcy Act and that specified in state insolvency laws. States may not pass or enforce laws to interfere with or complement the Bankruptcy Act or to provide additional or auxiliary regulations.

*International Shoe Co. v. Pinkus,* 278 U.S. 261, 263–265, 49 S.Ct. 108, 73 L.Ed. 318 (emphasis added) (citations omitted).

■ The court in *In re Cross* explained why the issue of exempt property falls squarely within the bankruptcy powers granted to Congress under the Constitution.

"Bankruptcy is both a creditor's remedy and a debtor's right." *In re Marchiando,* 13 F.3d 1111, 1115 (7th Cir.1994). One consequence of this duality is that bankruptcy law is simultaneously pursuing two contradictory goals. On the one hand, it seeks to provide a distribution to creditors by liquidating the debtor's property. At the same time, however, it also seeks to give the debtor a "fresh start" through the bankruptcy discharge and by allowing the debtor to keep property from creditors through exemptions. *See, Burlingham v. Crouse,* 228 U.S. 459, 473, 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913). These goals compete with one another so that as we try to increase the interests of one group we cannot avoid circumscribing the interests of the other. For example, by excepting debts from the scope of any discharge, we enhance the rights of some creditors and improve the likelihood that their debts will be paid; yet, by refusing to relieve the debtor of a portion of its debt, the value of its fresh start is diminished. Conversely, if we enhance the debtor's fresh start by allowing it to exempt more property, we undermine the interests of creditors by reducing the assets that can be liquidated to satisfy their claims. Because of this inherent tension between debtors and creditors, in crafting the current Bankruptcy Code, Congress necessarily confronted their competing interests and sought to balance them when it allocated the consequences of bankruptcy between debtors and creditors. Just how it did this is reflected throughout the Bankruptcy Code. It can be found in the sections identifying what becomes property of the bankruptcy estate and what is excluded from it, how the assets of the estate are distributed among creditors, the exemptions available to a debtor and the ways in which a debtor can deal with the property it has exempted, the circumstances under which a debtor may receive a discharge and the nature of the debts that will survive discharge, as well as many more.

\* \* \* \* \* \*

Controlling the distribution of assets between a debtor and its creditors goes to the heart of the bankruptcy process.

*In re Cross,* 255 B.R. 25, 32–34 (Bankr. N.D.Ind.2000).

Therefore, at first blush, Michigan's recently enacted exemption statute would appear to be unconstitutional. Congress has clearly established an exemption scheme for debtors to use in conjunction with the Bankruptcy Code it has enacted. See 11 U.S.C. § 522(d).

It is equally clear that the exemptions Michigan now permits under MICH. COMP. LAWS § 600.5451(1) compete with the Section 522(d) exemptions. Indeed, the exemptions permitted under MICH. COMP. LAWS § 600.5451(1) are more generous

than those permitted under Section 522(d). For example, the Michigan statute allows a bankrupt debtor to exempt up to $2,000.00 in farm animals, crops, and feed, and up to $500.00 in a computer and its accessories, MICH. COMP. LAWS § 600.5451(1)(e) and (h), whereas Section 522(d) does not offer any comparable exemption. More to the point, the Michigan statute permits a bankrupt debtor to exempt $30,000.00 and perhaps even $45,000.00 of the equity in the debtor's "homestead," MICH. COMP. LAWS § 600.5451(1)(n), whereas Section 522(d) limits the debtor's exemption of the equity in his or her residence to $19,425.00. 11 U.S.C. § 522(d)(1) and (5).

Why, then, would the Michigan legislature have the temerity to enact a statute that so clearly interferes with Congress' own pronouncements regarding an issue that, as the court in *Cross* put it, lies "at the heart of the bankruptcy process?" *Id.* Wasn't the Michigan legislature aware of *International Shoe's* prohibition against states passing laws that interfere with or complement the Bankruptcy Code?

█ The explanation for this apparently rash behavior is found in Section 522 itself, for that section offers a second set of exemptions from which the debtor may choose. 11 U.S.C. § 522(b). These exemptions, which are often referred to as the "state exemptions," are set forth in Section 522(b)(2).

> (2) (A) **any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law** that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place; and
>
> (B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

11 U.S.C. § 522(b)(2) (emphasis added).

The Michigan legislature undoubtedly seized upon the general reference in Section 522(b)(2)(A) to state-recognized exemptions as its justification for fashioning bankruptcy specific exemptions of its own. Indeed, MICH. COMP. LAWS § 600.5451(1) actually references Section 522(b)(2).[3]

Therefore, the question presented in this instance is less about the constitutionality of MICH. COMP. LAWS § 600.5451 and more about the proper interpretation of Section 522(b)(2). In other words, has Congress, through the enactment of Section 522(b)(2), empowered the Michigan legislature to create a customized set of bankruptcy exemptions for its residents? If Congress has in fact properly given each state legislature the authority to customize its own set of bankruptcy exemptions for that state's residents, then the constitutional concerns about their interference with the bankruptcy laws evaporate. On the other hand, if Section 522(b)(2) does not grant states this authority, then there is no question that MICH. COMP. LAWS § 600.5451 is in violation of the Supremacy

---

3. Michigan has long recognized a set of exemptions for debtors to claim in connection with a creditor's enforcement of a judgment. MICH. COMP. LAWS § 600.6023. MICH. COMP. LAWS § 600.5451 does not replace MICH. COMP. LAWS § 600.6023. Rather, MICH. COMP. LAWS § 600.5451 appears to simply expand the universe of exemptions from which a debtor may choose should the debtor elect Section 522(b)(2) as the exemption scheme in his bankruptcy proceeding.

Clause and, therefore, it cannot stand. *International Shoe*, 278 U.S. at 265, 49 S.Ct. 108.

Whether Section 522(b)(2) actually gives state legislatures this authority is ambiguous. On the one hand, Section 522(b)(2)(A)'s inclusion of only "non-bankruptcy" federal exemptions within its ambit suggests that the state exemptions that it also includes are only the general exemptions offered to all debtors under that state's debt enforcement laws. Put differently, if Congress limited Section 522(b)(2)(A)'s scope to only those exemptions that are generally recognized under federal law (*i.e.*, only those federal exemptions that are recognized outside of the Bankruptcy Code), then it is reasonable to conclude that Congress similarly limited the scope of the state exemptions under that section to only those exemptions recognized under that state's general debt enforcement laws.

On the other hand, Section 522(b)(2)(A) can also be interpreted as permitting states to design their own bankruptcy specific exemptions. Section 522(b)(2)(A) certainly does not explicitly prohibit such an enactment. Moreover, Congress's exclusion of bankruptcy specific exemptions from the federal exemptions permitted under Section 522(b)(2)(A) is as likely an effort by Congress to prevent an overreaching debtor from adding the separate Section 522(d) exemptions to the federal exemptions claimed under Section 522(b)(2)(A) as it is an expression by Congress of its intention to limit what the states may offer as their own exemption scheme under that section.

The court in *Cross* apparently agreed that Section 522(b)(2)(A) is ambiguous, for it relied heavily on the legislative history underlying that section to conclude that a state's right to fashion exemptions under Section 522(b)(2) is limited.[4] It observed that one of the most controversial debates regarding the development of what is now the Bankruptcy Code involved the scope of exemptions available to debtors. *Cross*, 255 B.R. at 33. That debate focused on whether there should be a uniform set of exemptions available to all debtors nationwide or whether the bankruptcy laws should continue to recognize only those exemptions permitted by the debtor's particular state. The resolution of this debate, according to *Cross*, is reflected in Section 522. Congress in effect avoided the issue by giving debtors the opportunity to choose between the exemptions Congress was willing to grant under Section 522(d) and the exemptions that otherwise would be available under applicable non-bankruptcy law. *Id.* However, equally important was Congress' decision to allow each state to "opt out" of the federal exemption scheme so that the state could restrict its residents to only the exemp-

---

4. The court in *Cross* did not actually discuss whether Section 522(b)(2)(A) was ambiguous. Nonetheless, it is appropriate to assume that the court made this determination because it is well accepted that courts are not to stray from the statute itself in interpreting its meaning unless the statute is ambiguous.

> [T]his Court has repeated with some frequency: "Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language

is unclear." *Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1548, 70[79] L.Ed.2d 891 (1984). The language of § 109 is not unclear. Thus, although a court appropriately may refer to a statute's legislative history to resolve statutory ambiguity, there is no need to do so here.

*Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991). *See also, U.S. v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989).

tions available under that state's applicable non-bankruptcy laws. *Id.*

The court in *Cross* relied upon this "opt out" provision to explain why the states could not enact exemption statutes that applied only to bankruptcy proceedings.

> It is easier to understand why there are limits upon the states' ability to define exemptions if one first clearly understands precisely what the ability to opt out of the federal bankruptcy exemptions is and, more importantly, what is it not. What Congress actually gave to the states through the opt-out was the power to prevent their residents from taking advantage of the federal bankruptcy exemptions. *See* 11 U.S.C. § 522(b)(1)(the federal bankruptcy exemptions may be claimed "unless the State law ... specifically does not so authorize.") Having been given this ability—the power to forbid—is not the same thing has having been given the power to create. Thus, in giving states the ability to opt out of the federal bankruptcy exemptions Congress did not give them the authority to create bankruptcy exemptions. Instead, what the opt-out represents is a Congressional willingness to recognize the generally available exemptions that states have created for their own purposes in bankruptcy proceedings.

*Cross,* 255 B.R. at 34, n. 5.

However, the Constitution itself offers an even more compelling reason for why Section 522(b)(2)(A) cannot be interpreted as congressional authorization for state legislatures to fashion their own bankruptcy specific exemption schemes. The authority to enact bankruptcy laws is only one of two powers granted to Congress under the Constitution whereby Congress is directed by the states to enact uniform laws.[5] There is a historical explanation for this mandate. Treatment of debtors in 18th century England and the American colonies was much harsher than today. Individuals were frequently imprisoned if they were unable to pay their debts. A debtor could languish in prison for years unless he indentured himself or a friend or relative redeemed his obligations. Indeed, in England, a debtor could be put to death. *Cent. Va. Comm. Coll. v. Katz,* —— U.S. ——, 126 S.Ct. 990, 997–1000, 163 L.Ed.2d 945 (2006).

However, some of the colonies did offer debtors varying degrees of relief. The relief, though, was often illusory because it extended no further than the boundaries of that particular colony.[6] For example, a discharge granted to a debtor by a New Jersey court under New Jersey law would not guarantee the debtor from being imprisoned in Pennsylvania by a Pennsylvania court were he to later risk venturing into that state. Therefore, the framers of the Constitution were very interested in replacing this hodgepodge of bankruptcy relief with a single national law that would apply uniformly among all states. "Absent such a rule, ... perpetual imprisonment must be the lot of every man who fails; and all hope of retrieving his losses by honest and industrious pursuits, will be cut off from the unfortunate bankrupt." *Katz,*

---

**5.** Naturalization law is the other area where Congress is directed to enact uniform laws. U.S. CONST. art. I, § 8, cl. 4.

**6.** "At the time of the Revolution, only three of the thirteen colonies ... had laws discharging insolvents of their debts. No two of these relief systems were alike in anything but spirit. In four of the other ten colonies, insolven-

cy legislation was either never enacted or, if enacted, never went into effect, and in the remaining six colonies, full relief was available only for scattered, brief periods, usually on an *ad hoc* basis to named insolvents." (citation omitted).

*Katz,* 126 S.Ct. at 998, n. 6.

126 S.Ct. at 999 (quoting Jared Ingersoll, who later became a delegate at the Constitutional Convention).

The Bankruptcy Clause was adopted with little debate. *Id.* Its purpose is to ensure an all encompassing set of bankruptcy laws through congressional enactment.

The text of Article I, § 8, cl. 4, of the Constitution, however, provides that Congress shall have the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." Although the interest in avoiding unjust imprisonment for debt and making federal discharges in bankruptcy enforceable in every State was a primary motivation for the adoption of that provision, its coverage encompasses the entire "subject of Bankruptcies." The power granted to Congress by that Clause is a unitary concept rather than an amalgam of discrete segments.

*Id.*

The Sixth Circuit in turn has had the opportunity to comment upon the exclusive nature of the bankruptcy power that the sovereign states ceded to Congress upon their ratification of the Constitution.

As it was initially understood, the Bankruptcy Clause represented the states' total grant of their power to legislate on bankruptcy. In order for laws to be uniform, the laws must be the same everywhere. That uniformity would be unattainable if states could pass their own laws. Alexander Hamilton stated that the federal government had "exclusive jurisdiction" where the Constitution granted Congress the power to make uniform laws. "This must necessarily be exclusive; because if each State had power to prescribe a DISTINCT RULE, there could be no UNIFORM RULE." *The Federalist No. 32*, at 155 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001). The earliest cases similarly interpreted the grant of power as exclusive, noting that laws could be uniform only if a single agent were issuing them. Associate Justice Bushrod Washington, sitting as Circuit Justice, reasoned this way in *Golden v. Prince*, 10 F. Cas. 542 (C.C.D.Pa.1814), writing, "That the exercise of the power to pass bankruptc [sic] and naturalization laws by the state governments, is incompatible with the grant of a power to congress to pass uniform laws on the same subjects, is obvious, from the consideration that the former would be dissimilar and frequently contradictory; whereas the systems are directed to be uniform, which can only be rendered so by the exclusive power in one body to form them." *Id.* at 545. The authority was understood to be exclusive because any lesser grant would have defeated the grant's original purpose.

\*     \*     \*     \*     \*     \*

However, the justification for the grant of exclusivity was not a mere desire to have *one* system, but a system that rose above individual states' interests. As Joseph Story noted, there were fears that each state would frame a bankruptcy system that "best suits its own local interests, and pursuits" or that was marked "by undue domestic preferences and favours." 3 Joseph Story, *Commentaries on the Constitution* §§ 1102, 1104 (1833), *in The Founders' Constitution* (Phillip B. Kurland & Ralph Lerner eds., 1987). Indeed, setting bankruptcy policies on the state level would enable states to favor in-state creditors over similarly-situated out-of-state creditors. By granting the power to Congress exclusively, the Constitution prevented runaway states from defeating bankruptcy's goals.

*Hood v. Tennessee Student Assistance Corp. (In re Hood)*, 319 F.3d 755, 764–65 (6th Cir.2003), *aff'd and remanded*, 541 U.S. 440, 124 S.Ct. 1905, 158 L.Ed.2d 764 (2004).

It is the exclusive nature of the Bankruptcy Clause that presents the constitutional problem for MICH. COMP. LAWS § 600.5451. Again, that enactment is premised upon the theory that Section 522(b)(2) empowered the Michigan legislature with the authority to create its own set of bankruptcy specific exemptions. However, if, as the Supreme Court observed in *Katz* and Judge Grant observed in *Cross*, the Bankruptcy Clause is intended to encompass the entire "subject of Bankruptcies," including the subject of exemptions, and, if as the Sixth Circuit observed in *Hood*, the grant of that power is exclusive, then Congress cannot, short of a constitutional amendment, re-delegate to the states the authority to create such exemptions any more than it can re-delegate its taxing authority to the executive branch.

The issue of "impermissible delegation" has previously been raised in conjunction with Section 522. In *In re Sullivan*, 680 F.2d 1131 (7th Cir.1982), the debtors challenged the constitutionality of the Illinois legislature's election to "opt-out" of the federal set of exemptions provided under Section 522(d). One theory was that Congress could not adopt a federal scheme of exemptions under Section 522(d)(1) and also empower a state to deny its citizens the right to enjoy those exemptions without delegating back to the states its authority to enact bankruptcy laws. However, the court in *Sullivan* rejected this argument. It recognized "the long-established principle that the states retain the power to enact bankruptcy laws so long as they do not conflict with federal legislation." *Sullivan*, 680 F.2d at 1137 (citing *Sturges v. Crowninshield*, 17 U.S. (4

Wheat.) 122, 4 L.Ed. 529 (1819) as the source of this principle).

> (T)he power granted to congress may be exercised or declined, as the wisdom of that body shall decide. If, in the opinion of congress, uniform laws concerning bankruptcies ought not to be established, it does not follow, that partial laws may not exist, or that state legislation of the subject must cease. It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the states. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the states.

*Sturges*, 17 U.S. (4 Wheat.) at 195–96.

However, the Sixth Circuit's interpretation of *Sturges* is not so expansive. *Hood*, 319 F.3d at 765. The Sixth Circuit did recognize in *Hood* that *Sturges* represented a departure from the framer's original intent that the Bankruptcy Clause be an exclusive grant of power. However, the Sixth Circuit concluded that the exception created by *Sturges* was more a necessity of the times than a re-interpretation of how the authority to enact bankruptcy laws was to be allocated between Congress and the various states.

> Although this understanding that the federal power was exclusive eventually gave way to an acceptance that states could, in the absence of federal legislation, pass laws on bankruptcy, this development in no way undermines the understanding at the time of the Convention that the grant was exclusive. Congress did not pass its first bankruptcy act until 1800, repealed it in 1803, and was unable to enact further legislation until 1841. *See* David A. Skeel, Jr., *Debt's Dominion: A History of Bankruptcy Law in America* 25 (2001). In the absence of a federal bankruptcy

code, states were forced to rely on their own structures, and in 1819 the Supreme Court in *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 4 L.Ed. 529 (1819), ruled that the Bankruptcy Clause prohibited states from acting only where Congress had already acted. *Id.* at 193–96. However, the *Sturges* non-exclusivity interpretation was based less on the original understanding of the Convention than on the necessary of having *some* system in place when Congress could not enact bankruptcy legislation. After recounting the concerns over renegade state laws that led to the exclusivity and uniformity clause, Joseph Story noted that *Sturges's* non-exclusivity interpretation was by 1833

> firmly established by judicial decisions. As this doctrine seems now to have obtained a general acquiescence, it does not seem necessary to review the reasoning, on which the different opinions are founded; although, as a new question, it is probably as much open to controversy, as any one, which has ever given rise to judicial argumentation. But upon all such subjects it seems desirable to adopt the sound practical maxim, *Interest reipublicae, at finis sit litium.* [It concerns the state that there be an end to lawsuits]

Story, *Commentaries,* at § 1109. **Thus the later interpretations of the uniformity provision as not creating exclusive power in the federal government reflect administrative necessity rather than an understanding contrary to that expressed in *The Federalist No. 32.* As Hamilton, Story, and the other early interpreters make clear, the uniformity provision was intended to grant exclusive power to the federal government.**

*Hood,* 319 F.3d at 765 (emphasis added) (translation added).

■ The gist, then, of *Hood* is that Congress is the exclusive repository of the power to enact bankruptcy laws notwithstanding the exception later discovered in *Sturges.* Indeed, the Supreme Court in *International Shoe* confirmed *Hood's* interpretation when it observed that "[s]tates may not pass or enforce laws to interfere with **or complement** the Bankruptcy Act ...." *International Shoe,* 278 U.S. at 265, 49 S.Ct. 108 (emphasis added). Therefore, it follows that Congress cannot re-delegate or otherwise renounce this power without being in violation of the Constitution.

However, accepting *Hood's* interpretation of *Sturges* does not mean that *Sullivan* is wrong or that Section 522(b)(2) itself must be declared unconstitutional. As already discussed, a narrow interpretation of Section 522(b)(2) recognizes only those exemptions that a state generally extends to debtors under its debt enforcement laws. Indeed, the rules of statutory construction compel this narrower interpretation because the constitutionality of Section 522(b)(2) is at question.

> But, in determining whether the legislature, in a peculiar enactment, has passed the limits of its constitutional authority, every reasonable presumption must be indulged in favor of the validity of such enactment. It must be regarded as valid, unless it can be clearly shown to be in conflict with the constitution. It is a well-settled rule of constitutional exposition, that if a statute may or may not be, according to the circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed. (citations omitted).

*Sweet v. Rechel,* 159 U.S. 380, 392–93, 16 S.Ct. 43, 46, 40 L.Ed. 188 (1895). *See also, I.N.S. v. St. Cyr,* 533 U.S. 289, 299–300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001)

(courts are obligated to construe statutes to avoid serious constitutional problems if "fairly possible").

Limiting the scope of Section 522(b)(2)'s available exemptions under state law to only those exemptions that are generally permitted under that state's debt enforcement laws eliminates the constitutional issue of impermissible delegation. As Judge Grant in *Cross* observed:

> Recognizing otherwise applicable state exemptions in bankruptcy proceedings is not the same as allowing states to create exemptions just for those proceedings. The first situation simply recognizes non-bankruptcy entitlements. It allows debtors to protect the same property in bankruptcy that they could keep from creditors outside of bankruptcy. The second directly controls the distribution of assets between debtors and creditors and, thus, how the consequences of bankruptcy are allocated between them.

*Cross,* 255 B.R. at 34.

Put differently, it is within Congress' discretion under the Bankruptcy Clause to decide what is to be the set of exemptions available to debtors seeking bankruptcy relief. Congress can create its own scheme. It can establish more than one scheme. It can reference state law for purposes of defining the scheme it has chosen. For that matter, Congress could reference the laws of Kazakstan to define the bankruptcy exemption scheme if it were to so choose. What Congress cannot do under the Constitution is delegate to Kazakstan, to the states, or to any other entity the power to actually decide what is to be the appropriate scheme. That power is reserved under the Constitution for the exclusive exercise of Congress.

### *CONCLUSION*

The Chapter 7 Trustee's objection to Debtor's claimed exemption of her undivided interest in real property based upon MICH. COMP. LAWS § 600.5451(1)(n) is sustained because that subsection, along with the balance of MICH. COMP. LAWS § 600.5451, is unconstitutional. The Bankruptcy Clause of the Constitution gives Congress the exclusive power to establish what exemptions a debtor may claim in conjunction with a bankruptcy proceeding. Congress could not, nor did it, re-delegate to the states this power through its enactment of Section 522(b)(2)(A). Therefore, Michigan's attempt to create its own set of bankruptcy-specific exemptions is constitutionally unenforceable. *International Shoe,* 49 S.Ct. at 109–110.

The court will enter a separate order consistent with this opinion.