# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2820

_____

Anders H. Knudsen, doing business as    *
A & C Knudsen Farms; Cynthia J.    *
Knudsen,    *
   *
        Appellees,    *
   *   Appeal from the United States
      v.    *   District Court for the
   *   Northern District of Iowa.
Internal Revenue Service,    *
   *
        Appellant,    *
   *
Carol F. Dunbar,    *
   *
        Trustee,    *
   *
U. S. Trustee,    *
   *
        U.S. Trustee.    *

_____

No. 08-3627

_____

In re: James Daniel Schilke,    *
   *
        Debtor,    *
   *
_____    *
   *

United States of America,                    *
                                             *
                    Appellant,               *
                                             *    Appeal from the United States
          v.                                 *    District Court for the
                                             *    District of Nebraska.
James Daniel Schilke; Holly D. Schilke,      *
also known as Holly Denise Schilde;          *
Diane Schilke; Larry Schilke; State of       *
Nebraska, Department of Revenue,             *
                                             *
                    Appellees.               *

_____

Submitted: May 13, 2009
Filed:  September 16, 2009
_____

Before RILEY, SMITH, and COLLOTON, Circuit Judges.
_____

SMITH, Circuit Judge.

Section 1222(a)(2)(A) of 11 U.S.C. provides that a debtor's Chapter 12 plan must provide for the full payment of all priority claims under 11 U.S.C. § 507 "unless . . . the claim is a claim owed to a governmental unit that arises as a result of the sale . . . of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507 . . . ." In these consolidated appeals, the government challenges the applicability of § 1222 to income taxes arising out of sales of the property of the debtors, Anders H. Knudsen and Cynthia J. Knudsen (No. 08-2820) and James Daniel Schilke (No. 08-3627). In Nos. 08-2820 and 08-3627, the government asserts that § 1222(a)(2)(A) is inapplicable to the debtors' postpetition sale of farm assets. In No. 08-2820, the government contends that (1) the Knudsens' prepetition sale of their slaughter hogs

-2-

does not constitute a sale of a "farm asset used in the debtor's farming operation" under § 1222(a)(2)(A) and (2) the proper method for allocating the Knudsens' 2004 tax liability between the tax arising out of the transactions within the scope of § 1222(a)(2)(A) and the tax arising from those transactions outside of its scope is the "proration method" as opposed to the "marginal method."

For the reasons discussed below, we hold: (1) a Chapter 12 debtor may treat postpetition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under 11 U.S.C. § 503; (2) the Knudsens' prepetition sale of their slaughter hogs in 2004 constitutes the sale of a "farm asset used in the debtor's farming operation" under § 1222(a)(2)(A); and (3) the "marginal method" is the correct method to determine the allocation of taxes between priority and non-priority claims under § 1222(a)(2)(A).

Accordingly, we affirm the judgment of the bankruptcy court[1] in No. 08-3627.

In No. 08-2820, we affirm in part and reverse in part the judgment of the bankruptcy court. First, we reverse the part of the bankruptcy court's decision holding that the Knudsens' prepetition sale of their slaughter hogs in 2004 is not entitled to the benefit of § 1222(a)(2)(A). Second, we reverse the part of the bankruptcy court's decision holding that the "proration method" is the correct method to determine the allocation of taxes between priority and non-priority claims, as opposed to the "marginal method." Finally, we affirm the part of the bankruptcy court's decision holding that a Chapter 12 debtor may treat postpetition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under § 503. We remand to the bankruptcy court with instructions to confirm the

---

[1]The Honorable Thomas L. Saladino, United States Bankruptcy Judge for the District of Nebraska.

Knudsens' Fifth Amended and Substituted Plan of Reorganization in accordance with this opinion.

I. *Background*

A. *Knudsens*

The Knudsens, owners of a 160-acre Iowa farm, filed a voluntary bankruptcy petition under Chapter 12 of the Bankruptcy Code. The Knudsens' farming enterprise includes raising hogs. In the early 1990s, the Knudsens enlarged their hog operation, increasing their sow herd to 250. They also built a farrowing house and started selling feeder pigs. Although the Knudsens initially hired others to fatten their hogs, they eventually built two finishing barns, the first in 1995 and the second in 1996. By 1996, the Knudsens were operating a farrow-to-finish hog operation and were selling their own hogs as their main source of income.

In 1999, two swine disease outbreaks stifled the growth and profitability of the Knudsens' hog operation. Between 2000 and 2003, the Knudsens and their lender, St. Ansgar State Bank ("St. Ansgar"), became concerned about the financial future of the Knudsens' farm. St. Ansgar became less willing to lend money to finance the Knudsens' farm business. As a result, the Knudsens considered reorganizing their farming operation. In December 2003, the Knudsens entered into two ten-year contracts to raise hogs for Squealers Pork, Inc. (SPI). Under the contract's terms, SPI would provide baby pigs to the Knudsens, and the Knudsens would raise the pigs to market weight. Because of its fears of swine disease, SPI required the Knudsens to completely dispose of their own swine before they started raising hogs for SPI. Consequently, the Knudsens, in 2004, sold the last of their breeding sows and all of their slaughter hogs. They used the hog sale proceeds to make a payment on a loan from St. Ansgar, which was secured by the hogs. Additionally, because of the change in their hog operation, the Knudsens sold a livestock trailer and their interest in some farrowing equipment. The Knudsens also ended their grain farming operation and leased their 160 acres for cash rent of $20,000 per year.

In their joint 2004 federal income tax return, the Knudsens reported farm income of $525,384 for sales of "livestock, produce, grains, and other products." This figure included the sale of the slaughter hogs. The Knudsens reported (1) net farm income of $65,336 for 2004, (2) the sale of their breeding sows as a capital gain of $34,077, and (3) proceeds of the sale of the farrowing equipment and the livestock trailer as an ordinary gain of $21,659. As shown on their initial 2004 return, the Knudsens' total tax for 2004 was $19,550.

Thereafter, the Knudsens filed an amended 2004 federal income tax return, showing their 2004 federal tax to be $55,839. The Knudsens' taxes increased because they revoked an election to treat certain hog building remodeling costs as expenses rather than to depreciate the costs over time. This amendment decreased farm expenses for 2003, thus increasing the Knudsens' income. The Knudsens filed for bankruptcy shortly after submitting their amended 2004 tax return.

In their reorganization plan, the Knudsens contended that income tax relating to the 2004 sale of the slaughter hogs qualified for treatment as an unsecured claim pursuant to 11 U.S.C. § 1222(a)(2)(A). As a result, the Knudsens asserted that $43,248 of their 2004 total tax liability of $55,839 should be classified as an unsecured claim. The plan further proposed funding the reorganization by selling certain machinery and equipment, as well as 120 acres of the 160-acre farm. As with the sale of the slaughter hogs, the Knudsens asserted that the taxes arising from these postpetition sales would qualify for treatment as an unsecured claim under § 1222(a)(2)(A).

The Internal Revenue Service (IRS) objected to the Knudsens' proposed plan, challenging, among other things, the Knudsens' proposed treatment of federal taxes attributable to the 2004 sale of the slaughter hogs and the postpetition sale of the machinery and land. According to the IRS, § 1222(a)(2)(A) did not apply to taxes arising out of the 2004 sale of the slaughter hogs because slaughter hogs did not

-5-

qualify as a "farm asset used in the debtor's farming operation." The IRS contended that the slaughter hogs were not an asset used in a farming operation but rather were the end product produced by the farming operation. *See* 11 U.S.C. § 1222(a)(2)(A). The IRS also opposed the Knudsens' proposed method for allocating their 2004 tax liability between unsecured and priority tax claims, contending that the Knudsens' method took "an incorrect and unwarranted advantage of lower tax rates." Finally, the IRS maintained that § 1222(a)(2)(A) did not apply to the Knudsens' postpetition sale of the machinery and land, arguing that § 1222(a)(2)(A) restricted its benefits to claims that qualified for priority treatment under 11 U.S.C. § 507, which sets forth certain claims and expenses entitled to priority, and that the postpetition taxes did not qualify for any of § 507's enumerated categories.

The bankruptcy court denied confirmation of the Knudsens' plan. First, the bankruptcy court held that the beneficial tax treatment for farms under § 1222(a)(2)(A) did not apply to the Knudsens' prepetition sale of the slaughter hogs. According to the court, the phrase "used in the debtor's farming operation" in § 1222(a)(2)(A) should be accorded the same meaning and treatment as the phrase "property used in the trade or business" in 26 U.S.C. § 1231(b)(3) of the Internal Revenue Code (IRC). *In re Knudsen*, 356 B.R. 480, 485–86 (Bankr. N.D. Iowa 2006) (internal quotations omitted). Section 1231(b)(3) "provides capital gain treatment for taxes arising from the sale of breeding livestock." *Id*. at 485. The court concluded that § 1222(a)(2)(A), like § 1231, is limited to capital assets. *Id*. at 486.

Second, as to the allocation of taxes, the bankruptcy court applied the IRS's "proration method" to determine the amount of tax that qualifies for beneficial treatment under § 1222(a)(2)(A) instead of the Knudsens' "marginal method." The court found

> that the proration method is the better method for determining what
> amount of tax qualifies for beneficial treatment under § 1222(a)(2)(A)

and what does not. It recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income. It divides the actual tax without regard to which sales produced the last dollar of income.

*Id*. at 487.

Third, as to the applicability of § 1222(a)(2)(A) to postpetition transactions, the bankruptcy court held that the

Knudsens may pay through the estate, as administrative expenses, income taxes incurred by them during the pendency of the case, that they may treat a portion of such taxes as nonpriority unsecured claims under the plan pursuant to § 1222(a)(2)(A) and that such nonpriority unsecured taxes incurred postpetition may be discharged with prepetition unsecured debts after completion of the plan.

*Id*. at 492.

Ultimately, the bankruptcy court rejected confirmation of the Knudsens' proposed plan because its "rulings against certain of [the Knudsens'] positions make the plan as proposed unconfirmable." *Id*.

Both parties appealed to the district court. The Knudsens argued that the bankruptcy court erred by (1) excluding their prepetition sale of slaughter hogs in 2004 from the benefit provided by § 1222(a)(2)(A) and (2) applying the IRS's "proration method" to determine the amount of tax that qualifies for beneficial treatment under § 1222(a)(2)(A) instead of their "marginal method." The IRS challenged the bankruptcy court's ruling on the applicability of § 1222(a)(2)(A) to postpetition sales of assets.

The district court affirmed in part and reversed in part the bankruptcy court, remanding to the bankruptcy court with instructions to confirm the Knudsens' plan. *In re Knudsen*, 389 B.R. 643, 682 (N. D. Iowa 2008). First, the district court held that the slaughter hogs that the Knudsens sold in order to convert their farrow-to-finish hog operation into a reorganized custom hog-raising operation qualified as "farm assets" used in the Knudsens' "farming operation" under § 1222(a)(2)(A). *Id*. at 664–65 (internal quotations omitted). Second, it determined that

> the "marginal method" is the correct method to determine the allocation of taxes between priority and non-priority claims. To apply that method, the Knudsens should calculate a return for all income, then a second "pro forma" tax return removing all qualifying sales income, so that non-qualifying income would be taxed at lower marginal tax rates, and the taxes shown on the "pro forma" return would represent the portion of the tax claim entitled to priority status, while the difference between the taxes shown on the return for all income and the taxes shown on the "pro forma" return would represent the unsecured portion of the tax claim. The bankruptcy court erred, as a matter of law, in choosing the "proration method" instead.

*Id*. at 669. Finally, the court "affirm[ed] the bankruptcy court's conclusion that a Chapter 12 debtor may treat post-petition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under § 503 and that the plan may propose payment of such expenses by the estate." *Id*. at 682. According to the court, such taxes were "incurred by the estate" within the meaning of § 503(b)(1)(B)(i), despite the fact that a Chapter 12 estate is not a separate taxable entity, because "incurred by the estate" refers to when tax liability is incurred rather than to the existence of an estate as a separate taxable entity. *Id*. at 680–82.

## B. *Schilke*

Schilke filed a voluntary bankruptcy petition under Chapter 12 of the Bankruptcy Code. Thereafter, he submitted his Chapter 12 plan to the bankruptcy

court. The proposed plan provided, inter alia, that Schilke would sell certain farm assets—real estate and breeding livestock. Schilke estimated that his taxable income for tax year 2007 from the sale of these assets would be $175,000 and that his estimated capital gains taxes would be $33,108. The proposed plan treated the capital gains taxes as follows:

> CLASS V: INTERNAL REVENUE SERVICE and NEBRASKA DEPARTMENT OF REVENUE: Any income tax resulting from the sale of real estate and livestock as provided in this Plan or any amendments or modifications shall be treated as an unsecured debt without priority under 11 USC § 507 as provided in 11 USC § 1222[(a)](2)(A).

The government objected to this provision of the proposed plan, asserting that Schilke's "post-petition tax liabilities, whether pre-confirmation or post-confirmation, are not, and cannot be, administrative expenses of the bankruptcy estate, should not be included in Debtor's Plan, and cannot be discharged." In its supporting brief, the government argued that the benefits of § 1222(a)(2)(A) applied only to priority claims under 11 U.S.C. § 507 and that, in Schilke's case, the taxes could only receive priority under that section if they constituted administrative expenses pursuant to 11 U.S.C. § 503(b); under § 503(b)(1)(B)(i), a tax must be "incurred by the estate" to be an administrative expense. According to the government, the taxes at issue did not meet this requirement because a Chapter 12 bankruptcy estate is not a separate taxable entity.

The bankruptcy court overruled the government's objection, holding that

> even though a Chapter 12 bankruptcy estate is not a separate taxable entity, the estate does exist nonetheless. The estate consists of all property of the debtor on the date of filing, all property that the debtor acquires after commencement of the case, and all earnings from services performed by the debtor after commencement of the case. 11 U.S.C § 1207(a). Debtor filed a motion to sell real estate and personal property

free and clear of liens (Fil.# 12), which was granted (Fil.# 14). The taxes at issue are created by the sale of property of the estate by Debtor. I do not believe that the language of § 503(b)(1)(B) regarding any tax "incurred by the estate" was intended to apply only to those situations where the estate itself is a separate taxable entity. In fact, "incurred by the estate" has been interpreted to simply mean incurred post-petition. [*Mo. Dep't of Revenue v.*] *L.J. O'Neill Shoe Co.*, 64 F.3d [1146,] 1149 [(8th Cir. 1995)] (stating "[t]he bankruptcy court and the district court both held that while the entire corporate tax was 'incurred by the estate'(i.e.—incurred post-petition) . . . ."). Here, there clearly is an estate, the tax is the result of a sale of property of the estate, and Debtor happens to be liable for that tax.

*In re Schilke*, 379 B.R. 899, 902 (Bankr. D. Neb. 2007).

The government appealed to the district court, challenging the bankruptcy court's confirmation of Schilke's Chapter 12 plan. The district court affirmed the bankruptcy court's determination that taxes arising from the postpetition sale of real estate and livestock may be attributed to the estate and not to the debtor, meaning that the resulting claim is an unsecured claim under § 1222(a)(2)(A).

## II. *Discussion*

In Nos. 08-2820 and 08-3627, the government asserts that § 1222(a)(2)(A) is inapplicable to both the Knudsens' and Schilke's postpetition sale of farm assets. Additionally, in No. 08-2820, the government contends that (1) the Knudsens' prepetition sale of their slaughter hogs does not constitute a sale of a "farm asset used in the debtor's farming operation" under § 1222(a)(2)(A) and (2) the proper method for allocating the Knudsens' 2004 tax liability between the tax arising out of the transactions within the scope of § 1222(a)(2)(A) and the tax arising from those transactions outside of its scope is the "proration method."

"When a bankruptcy court's judgment is appealed to the district court, the district court acts as an appellate court and reviews the bankruptcy court's legal determinations de novo and findings of fact for clear error." *Fix v. First State Bank of Roscoe*, 559 F.3d 803, 808 (8th Cir. 2009) (internal quotations and citations omitted). In our position as "the second court of appellate review, we conduct an independent review of the bankruptcy court's judgment applying the same standards of review as the district court." *Id.* (internal quotations and citation omitted).

A. *Applicability of 11 U.S.C. § 1222(a)(2)(A) to Postpetition Transactions*

On appeal, the government asserts, with respect to both the Knudsens and Schilke, that § 1222(a)(2)(A) does not apply to the postpetition sale of farm assets. First, the government argues that Chapter 12's framework establishes that plans under Chapter 12 are binding only upon prepetition creditors, not holders of postpetition claims. If true, then § 1222(a)(2) does not apply to any postpetition claim. According to the government, pursuant to 11 U.S.C. § 1227(a), the provisions of Chapter 12 are only binding on "creditors." In turn, a "creditor" is defined as an "entity that has a claim against the debtor that arose *at the time of or before the order for relief* concerning the debtor." 11 U.S.C. § 101(10)(A) (emphasis added). As a result, a Chapter 12 plan cannot bind holders of postpetition claims because they are not "creditors," i.e., they are not holders of prepetition claims.

Second, the government argues that the Bankruptcy Code's waiver of sovereign immunity in 11 U.S.C. § 106 limits the extent to which a plan may bind the government. According to the government, pursuant to § 106(a)(1), it has waived its sovereign immunity with regard to, inter alia, § 1227, and therefore has agreed to be paid on its prepetition claims pursuant to a confirmed Chapter 12 plan. But the government contends that § 106(a)(1) does not contain a waiver of sovereign immunity as to § 1222, except to the extent that its provisions regarding the contents of a plan can bind the government as a "creditor" under § 1227(a). Therefore, the government concludes that, without an express waiver of sovereign immunity for

-11-

purposes of postpetition claims, a Chapter 12 plan that provides for treatment of a postpetition claim of the government cannot bind the government.

Third, the government asserts that even if the statutory framework did not prohibit the application of § 1222(a)(2)(A) to postpetition claims, income tax claims arising from postpetition asset sales would not constitute an "administrative expense" under 11 U.S.C. § 503(b)(1)(B)(i). The government notes that § 1222(a)(2)(A) applies to "claims" otherwise entitled to priority under 11 U.S.C. § 507; in turn, § 507(a)(2) provides priority for administrative expenses under § 503(b). But, according to the government, postpetition sales do not qualify as "administrative expenses" under § 503(b)(1)(B)(i) because this provision restricts its applicability to taxes "incurred by the estate"; in a Chapter 12 case, the only taxable entity is the debtor, meaning that taxes cannot be "incurred by the estate."

1. *Whether the Framework of Chapter 12 Dictates that 11 U.S.C. § 1222(a)(2)(A) Cannot Apply to Postpetition Claims*

We will first consider the government's argument that the statutory framework of Chapter 12 restricts the claims that are eligible for the benefits of § 1222(a)(2)(A) to prepetition claims.

A district court in Kansas recently considered—and rejected—a substantially similar argument to the one advanced by the government in the present case. *See Dawes v. Nazar (In re Dawes)*, No. 08-1054-WEB, 2009 WL 641278 (D. Kan. Mar. 12, 2009) (slip op.). In *Dawes*, the government asserted that § 1222(a)(2)(A) does not apply to postpetition claims, arguing, inter alia, that "Chapter 12 plans deal only with the treatment of pre-petition claims and are only binding upon creditors holding such claims." *Id*. at *3. The government contended that its view was "confirmed by reading sections 1226(b)(1), 1222, and 1227(a) together." *Id*. In rejecting the government's argument that § 1222(a)(2)(A) did not apply to it because it was not a "creditor," the district court stated:

-12-

The United States argues that Chapter 12 plans are only binding upon "creditors," not upon holders of post-petition claims, and it says "the binding effect of the plan can extend no further upon the United States." It points out that a "creditor" is defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor; an entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or an entity that has a community claim." 11 U.S.C. § 101(10).

*Id.* at *4.

Section 1222(a)(2)(A) does not mention "creditors." Rather, the statute specifically applies to "claim[s] owed to a government unit . . . [."] 11 U.S.C. § 1222(a)(2)(A). The term "claim" is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.["] 11 U.S.C. § 101(5)(A). In the case at hand, the IRS, a government unit, has a right to payment for capital gain taxes arising from the sale of the Debtors' farm property. It thus has a claim against the debtors. Section 1222, by its terms, is not limited to "creditors." Moreover, the court notes that appellant's suggested construction of the statute is inconsistent with Congress's apparent intent in adopting that section: " [sic] "[C]ongress has chosen to recognize the uncollectibility of the majority of the income taxes occasioned by the sale of the farm debtor's assets used in the farming operation. The 2005 Amendments provide financially strapped family farmers the opportunity to downsize and restructure their farming operations without the necessity of paying the taxes in full as required under old Chapter 12." 7 *W. Norton, Bankr. L. & Prac*. 3d § 130:6 (2009). The statute by its terms is not limited to "creditors," and it therefore cannot be read to apply only to pre-petition claims. Section 1222 addresses claims owed to a government unit, which includes the tax claim held by the IRS.

*Id.* at *5.

The court then addressed the government's argument that "post-petition claims in Chapter 12 cases are governed by 11 U.S.C. § 1226, and that when read with 11 U.S.C. § 1227 and 1222(a)(2)(A), the various sections confirm that holders of post-petition claims are not bound by Chapter 12 plans." *Id*. Section 1226(b)(1) states that "[b]efore or at the time of each payment to creditors under the plan, there shall be paid any unpaid claim of the kind specified in section 507(a)(2) of this title." *Id*. (internal quotations omitted). Section 1227(a) provides that

> [t]he provisions of a confirmed plan bind the debtor, each creditor, each equity security holder, and each general partner in the debtor, whether or not the claim of such creditor, such equity security holder, or such general partner in the debtor is provided for by the plan, and whether or not such creditor, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan.

*Id*. (internal quotations omitted). The court summarized §§ 1226(b)(1) and 1227(a) as dictating that "the confirmed plan binds the debtor and all the creditors. Furthermore, confirmation obligates the trustee to distribute all payments to creditors in accordance with the plan, and vests in the debtors all the rights in any post-petition acquired property." *Dawes*, 2009 WL 641278, at *5 (citing *Arkison v. Plata (In re Plata)*, 958 F.2d 918, 922 (9th Cir. 1992)).

The court also discussed 11 U.S.C. § 507. *Id*. at *6. Under § 1222(a)(2)(A), a Chapter 12 plan shall provide for the full payment of claims entitled to priority under § 507 "unless the claim 'is a claim owed to a governmental unit that arises as a result of the sale . . . of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507 . . . .'" *Id*. at *3. The bankruptcy court recognized that § 507 "lists the expenses and claims that have priority in bankruptcy." *Id*. at *6. Section 507(a)(8) gives priority status to certain prepetition taxes, while § 507(a)(2) gives priority status to "[a]dministrative expenses allowed under section 503(b)." *Id*. According to the

court, § 1226 "sets out that the administrative expenses should be paid before payment to creditors of the confirmed plan." *Id*. The court noted its prior conclusion that "post-petition taxes incurred by the estate qualify as administrative expenses pursuant to section 503(b)"—a conclusion that this court also reaches, as discussed *infra*—and that such expenses "are ordinarily a priority claim pursuant to section 507(a)(2)." *Id*. The court determined that the government's "argument that the foregoing sections necessarily preclude post-petition claims fails to take into consideration the specific language of section 1222(a)(2)(A)," noting that § 1222(a)(2)(A)

> specifically exempts from priority status a claim owed to a governmental unit that arises as a result of the sale of any farm asset, in which case the claim should be treated as unsecured. The claim of the IRS in this instance is a claim owed to a governmental unit, and it is the result of the sale of a farm asset, the farming property. The IRS' reliance on section 1226 and 1227 does not overcome the straightforward and specific language of § 1222(a)(2)(A).

*Id*.

We find the rationale of the district court in *Dawes* persuasive and now adopt its reasoning. As the *Dawes* court recognized, nothing in the plain language of § 1222(a)(2)(A) restricts its application to prepetition sales. Instead, the provision provides that a claim is stripped of its priority status if the claim is "owed to a governmental unit that arises as a result of the sale . . . of any farm asset used in the debtor's farming operation." Accordingly, we conclude, as did the district court in *Dawes*, that nothing in the provision restricts its application to only those dispositions that occur *before* the debtor files his bankruptcy petition, nor does § 1222(a)(2)(A) apply to merely "creditors" of the debtor, as it specifically refers to claims "owed to a governmental unit."

-15-

2. *Whether the Government Has Waived its Sovereign Immunity*

In a related argument, the government asserts that the Bankruptcy Code's waiver of sovereign immunity in 11 U.S.C. § 106 limits the extent to which a plan may bind the government. According to the government, pursuant to § 106(a)(1), it has waived its sovereign immunity with regard to, inter alia, 11 U.S.C. § 1227 and, therefore, has agreed to be paid on its prepetition claims pursuant to a confirmed Chapter 12 plan. But the government contends that § 106(a)(1) does not contain a waiver of sovereign immunity as to 11 U.S.C. § 1222, except to the extent that its provisions regarding the contents of a plan can bind the government as a "creditor" under § 1227(a). Thus, the government concludes that, without an express waiver of sovereign immunity for purposes of postpetition claims, a Chapter 12 plan that provides for treatment of a postpetition claim of the government cannot bind the government.

Although our review of the record indicates that the government never raised the defense of sovereign immunity before the bankruptcy court in either the Knudsens' case or Schilke's case, "sovereign immunity is a jurisdictional issue that may be raised for the first time on appeal." *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (citing *Harmon Indus. v. Browner*, 191 F.3d 894, 903 (8th Cir. 1999)). But a "belated assertion of sovereign immunity" is a factor that may be "relevant to the issue of waiver." *Rose v. U.S. Dep't of Educ. (In re Rose)*, 187 F.3d 926, 930 n.7 (8th Cir. 1999). Therefore, although we will consider the government's sovereign immunity argument, we bear in mind that such argument is belated and that its untimeliness can be a factor used in evaluating whether the government has waived its sovereign immunity.

Section 106(a)(1) provides that "sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . . [§] 1227 . . . of this title." In turn, § 1227 states that

-16-

> the provisions of a confirmed plan bind the debtor, *each creditor*, each equity security holder, and each general partner in the debtor, whether or not the claim of such *creditor,* such equity security holder, or such general partner in the debtor is provided for by the plan, and whether or not such *creditor*, such equity security holder, or such general partner in the debtor has objected to, has accepted, or has rejected the plan.

(Emphasis added.)

Section 101(10)(A) of 11 U.S.C. defines "creditor" as, inter alia, an "entity that has a claim against the debtor that arose at the time of or before the order of relief concerning the debtor." In turn, 11 U.S.C. § 501(a) informs us *who* may file a proof of claim. According to this section, "[a] creditor or an indenture trustee may file a proof of claim."

In the present case, the government essentially argues that because it is not a "creditor" within the meaning of § 101(10)(A)—i.e., its claims against the Knudsens and Schilke did not arise at the time of or before the order of relief—it cannot be bound under a Chapter 12 plan that provides for the treatment of a government's postpetition claim under § 1222(a)(2)(A), as § 1227(a) only waives sovereign immunity as to the claim of a "creditor."

But, as we previously acknowledged, § 1222(a)(2)(A) "'specifically exempts from priority status a claim owed to a governmental unit.'" *See supra* Part II.A.1 (quoting *Dawes*, 2009 WL 641278, at *6). Nowhere in the language of § 1222(a)(2)(A) does it condition application of the section to situations in which the government is a "creditor" of the debtor. Instead, § 1222(a)(2)(A) clearly and unequivocally applies to a "governmental unit," regardless of whether that "governmental unit" qualifies as a "creditor" of the debtor under § 1227(a). *See supra* Part II.A.1.

Furthermore, aside from the "straightforward and specific language of § 1222(a)(2)(A)," *Dawes*, 2009 WL 641278, at *6, the government, pursuant to § 106(a)(1), has waived its sovereign immunity with regard to, inter alia, 11 U.S.C. § 503. Section 1222(a)(2)(A) states that if "the claim is a claim owed to a governmental unit that arises as a result of the sale . . . of any farm asset used in the debtor's farming operation," then the claim is "treated as an unsecured claim that is *not entitled to priority under section 507*." (Emphasis added.) Section 507(a)(2) gives priority status to "*administrative expenses* allowed under *section 503(b)*." (Emphasis added.) In turn, § 503(b)(1)(B)(i) allows for "any tax . . . incurred by the estate, whether secured or unsecured" to be treated as an administrative expense. As explained *infra*, "incurred by the estate" means "incurred postpetition." *See infra* Part II.A.3. Section 106 explicitly states that the government's "sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to . . . [§] 503 . . . of this title."

Accordingly, we hold that the government's sovereign immunity argument necessarily fails.

### 3. *Whether Postpetition Taxes Qualify as an "Administrative Expense" Under 11 U.S.C. § 503(b)(1)(B)(i)*

The key question in the present cases is whether the postpetition taxes incurred by both the Knudsens and Schilke should be considered administrative expenses. As administrative expenses, the taxes would have priority status under 11 U.S.C. § 507(a)(2) via 11 U.S.C. § 503(b)(1)(B)(i), thereby allowing the Chapter 12 plan to treat such expenses as nonpriority unsecured claims under § 1222(a)(2)(A). Thus, we now address the government's final argument that postpetition taxes do not qualify as administrative expenses under 11 U.S.C. § 503(b)(1)(B)(i) because they are not "incurred by the estate" as required by that provision.

Section 1222 of 11 U.S.C. addresses the contents of a debtor's Chapter 12 plan. Under subsection (a)(2)(A), such a plan must

> provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless . . . the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge . . . .

In turn, § 507 provides for two categories of taxes that are entitled to priority. Section 507(a)(8) gives priority status to certain prepetition taxes, while § 507(a)(2) gives priority status to "administrative expenses allowed under section 503(b) of this title, and any fees and charges assessed against the estate under chapter 123 of title 28." Section 503(b)(1)(B)(i) allows for "any tax . . . incurred by the estate, whether secured or unsecured" to be treated as an administrative expense.

We have previously recognized that "incurred by the estate" means "incurred postpetition."[2] *O'Neill*, 64 F.3d at 1149 ("The bankruptcy court and the district court both held that while the entire corporate tax was 'incurred by the estate' (i.e.—incurred postpetition), the portion of the tax attributable to prepetition income was 'of a kind specified in section 507(a)(7).'"). We are not alone in our understanding of the meaning of "incurred by the estate." *See, e.g.*, *W. Va. State Dep't of Tax & Revenue v. I.R.S. (In re Columbia Gas Transmission Corp.)*, 37 F.3d 982, 984 (3d Cir. 1994)

---

[2]We recognize that *O'Neill* was a Chapter 11 corporate case, not a Chapter 12 case. But, in both types of cases, there is no "separate taxable entity." *O'Neill*, 64 F.3d at 1151 n.7 (stating that 11 U.S.C. § 346(c) and 26 U.S.C. § 1399 "dictate[] that the bankruptcy estate of the corporate debtor is not a separate taxable entity."). Furthermore, as the persuasive authority cited *supra* indicates, a general understanding exists that "incurred by the estate" means "incurred postpetition."

("The priority for taxes 'incurred by the estate' extends only to taxes 'incurred' postpetition."); *In re Baltimore Marine Indust., Inc.*, 344 B.R. 407, 414 (Bankr. D. Md. 2006) ("The only requirement for a tax to be accorded administrative priority under the statute is that it must be incurred by the bankruptcy estate, and thereby of necessity, be incurred postpetition."); *In re Pub Dennis of Cumberland, Inc.*, 142 B.R. 38, 41 n.4 (Bankr. D. R.I. 1992) ("The language 'incurred by the estate' relates only to taxes which are incurred post-petition, *i.e.* after the estate is created."); *In re Northeastern Ohio Gen. Hosp. Ass'n*, 126 B.R. 513, 515 (Bankr. N.D. Ohio 1991) ("Taxes incurred by the estate are administrative expenses pursuant to Section 503(b)(1)(B)(i). Because the estate does not exist pre-petition, priority treatment is limited to taxes incurred post-petition."); *Collier's on Bankruptcy* ¶ 503.07 (15th ed. rev. 2008) ("Only taxes 'incurred by the estate' can be administrative expenses. Therefore, first priority for tax claims extends to only postpetition taxes because before the petition is filed, there is no estate.").

Additional factors also support our conclusion that postpetition income taxes are "administrative expenses," as such taxes were incurred by the estate, i.e., incurred postpetition. First, the plain language of § 1222(a)(2)(A) does not restrict its application to prepetition sales. *See Cincinnati Ins. Co. v. Bluewood, Inc.*, 560 F.3d 798, 803 (8th Cir. 2009) ("The primary rule of statutory interpretation is to give effect to legislative intent as reflected in the plain language of the statute.") (internal quotations and citation omitted).

Second, it is the IRC, *not the Bankruptcy Code*, that creates a "separate taxable entity" upon the filing of petitions by individuals under Chapters 7 and 11 but does not create a separate taxable entity in cases filed by individuals under Chapters 12 and 13. *Compare* 26 U.S.C. § 1398 *with* 26 U.S.C. § 1399. Additionally, even though there is no "separate taxable entity" in a Chapter 12 case, an "estate" still exists, pursuant to 11 U.S.C. § 1207(a), which provides:

-20-

§ 1207. Property of the estate

(a) Property of the estate includes, in addition to the property specified in section 541 of this title—

(1) all property of the kind specified in such section that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first; and

(2) earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7 of this title, whichever occurs first.

Here, the taxes at issue result from the postpetition sale of the Knudsens' machinery and land assets, as well as Schilke's postpetition sale of real estate and breeding livestock. The sale of these assets certainly falls within the ambit of § 1207(a).

Finally, we also note that the majority of courts to have considered this precise issue have also reached the same result, rejecting the government's argument that postpetition income taxes cannot be "incurred by the estate" because a bankruptcy filing under Chapter 12 does not create a separate taxable entity under 26 U.S.C. § 1399 of the IRC. *See, e.g.*, *Hall v. United States (In re Hall)*, 393 B.R. 857 (D. Ariz. 2008) (appeal pending in the Ninth Circuit); *In re Dawes*, 382 B.R. 509 (Bankr. D. Kan. 2008), *aff'd*, No. 08-1054-WEB, 2009 WL 641278 (D. Kan. Mar. 12, 2009) (slip op.) (appeal pending in the Tenth Circuit); *In re Gartner*, No. BK06-40422-TLS, 2008 WL 5401665 (Bankr. D. Neb. Dec. 29, 2008) (appeal to the district court stayed pending outcome of present cases); *In re Rickert*, No. BK06-40253-TLS, 2008 WL 5401663 (Bankr. D. Neb. Dec. 29, 2008) (appeal to the district court withdrawn and judgment of dismissal with prejudice entered); *In re Uhrenholdt,* No. BK06-40787-TLS, 2009 WL 198966 (Bankr. D. Neb. 2009) (appeal to the district court stayed pending bankruptcy court's approval of parties' proposed settlement). *But*

*see In re Hall*, 376 B.R. 741 (Bankr. D. Ariz. 2007), *rev'd*, 393 B.R. 857 (D. Ariz. 2008); *In re Whall*, 391 B.R. 1 (Bankr. D. Mass. 2008).

Accordingly, we affirm the bankruptcy courts' judgment that § 1222(a)(2)(A) applies to the postpetition sale of farm assets.

B. *Treatment of Taxes on the Sale of the Knudsens' Slaughter Hogs*

The government asserts that 11 U.S.C. § 1222(a)(2)(A) does not apply to the Knudsens' 2004 sale of their slaughter hogs in their Chapter 12 case. The government bases this assertion on its view that the hogs were not "farm asset[s] used in the debtor's farming operation" but instead were the end product of the farming operation. According to the government, the plain meaning of § 1222(a)(2)(A) establishes that it applies to the sale of a farm asset "put into action or service to bring about the desired end of debtor's farming operation." The government concedes that the Knudsens' breeding sows and equipment, such as the farrowing crates, meet this requirement. But it contends that the slaughter hogs, which were produced and sold in the ordinary course of the Knudsens' farrow-to-finish operation, do not. According to the government, the slaughter hogs "were the farm product" instead of farm assets used in production. The government supports its interpretation of § 1222(a)(2)(A) by reference to 26 U.S.C. § 1231 of the IRC. The government thus argues that the district court, in reversing the bankruptcy court, erred by defining the Knudsens' farming operation broadly to mean their farming operation under their reorganization plan.

"The proper construction of any statute, the Bankruptcy Code included, begins with the language of the statute itself." *Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*, 177 F.3d 719, 722 (8th Cir. 1999). "The long established plain language rule of statutory construction requires examining the text of the statute as a whole by considering its context, object, and policy." *United States v. Bolden*, 545 F.3d 609, 632 (8th Cir. 2008) (internal quotations and citation

omitted). We examine the statute's "express language and overall purpose" when interpreting a statute. *Martin v. Cox, (In re Martin)*, 140 F.3d 806, 808 (8th Cir. 1998).

As we have previously discussed, § 1222(a)(2)(A) provides that the Chapter 12 plan must

> provide for the full payment, in deferred cash payments, of all claims entitled to priority under section 507, unless—
>
> (A) the claim is a claim owed to a governmental unit that arises as a result of the sale, transfer, exchange, or other disposition of any farm asset used in the debtor's farming operation, in which case the claim shall be treated as an unsecured claim that is not entitled to priority under section 507, but the debt shall be treated in such manner only if the debtor receives a discharge . . . .

Section 1222(a)(2)(A) is, without doubt, complex and replete with legal terms of art. A full analysis of those terms would require examination of over 20 provisions of the Bankruptcy Code. *See* C. Richard McQueen & Jack F. Williams, *Tax Aspects of Bankruptcy Law and Practice* § 14:9 (3d ed. 2009). Fortunately, the only phrase at issue in the present case is "any farm asset used in the debtor's farming operation." 11 U.S.C. § 1222(a)(2)(A). To properly construe this phrase, we will consider the plain language of the phrase in three parts: (1) "any farm asset," (2) "used in," and (3) "the debtor's farming operation."

### 1. Any Farm Assets

Neither § 1222(a)(2)(A) nor any other provision in Chapter 12 defines the phrase "farm assets." But 11 U.S.C. §§ 541, 1207, 101, and 522 are instructive in defining "farm assets." *See* McQueen & Williams, *supra*. Section 541(a)(1) provides that the "property of the estate" consists of "all legal or equitable interests of the debtor in property as of the commencement of the case." Under § 1207(a), "[p]roperty of the estate includes, in addition to the property specified in section 541 . . . all

property of the kind specified in such section that the debtor acquires after the commencement of the case . . . ." Therefore,

> postpetition income is included in the ambit of the estate and is usually used to fund, along with other financial sources, the Chapter 12 farming operations plan. It is this property of the estate that is subject to administration under the Bankruptcy Code and is used to satisfy, among other things, allowed claims in accordance with the priority and distributional rules in bankruptcy.

McQueen & Williams, *supra*.

The term "property," as used in §§ 541 and 1207, is interchangeable with the term "asset," as used in §§ 101(18) and 522(2). *See id.* (noting that § 101(18) "uses the term 'assets related to a farming operation' to determine family farmer eligibility" and that, under § 522(a), "the individual debtor must file a 'Schedule of Assets'" so that the parties in interest can "determine the extent and value of the property of the estate"). "An 'asset' is defined as '1. An item that is owned and has value. 2. The entries on a balance sheet showing the items of property owned, including cash, inventory, equipment, real estate, accounts receivable, and goodwill. 3. *All the property of a person available for paying debts*.'" *Navarre v. Luna (In re Luna)*, 406 F.3d 1192, 1199 (10th Cir. 2005) (quoting *Black's Law Dictionary* 112 (7th ed. 1999)) (emphasis added). As a result, "§ 1222(a)(2)(A)'s use of the term 'any farm assets,' like § 522's use of the term 'assets' and §§ 541(a) and 1207's use of the term 'property,' is all encompassing and broadly defined." McQueen & Williams, *supra*.

Furthermore, § 101(18), (20), and (21) give a specific meaning to the phrase "farm assets," as used in § 1222(a)(2)(A). Section 101(18) provides that a "family farmer" is one "engaged in a farming operation." Section 101(20) defines a "farmer" as a "person that received more than 80 percent of [his] gross income during the taxable year . . .  immediately preceding the taxable year . . .  in which the case

-24-

. . . was commenced from a *farming operation* owned or operated by such person." (Emphasis added.) "Farming operation" is defined as including "farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). Thus, "farm assets" would include "any asset related to farming operations, whether or not actually used in farming operations." McQueen & Williams, *supra*. "Farm assets" would therefore include "capital assets under I.R.C. § 1231, other property that may receive favorable tax treatment under I.R.C. § 1232, and inventory items that would otherwise generate ordinary income under I.R.C. § 61." *Id*.

Here, the slaughter hogs were "assets," as they were the "property" of the Knudsens. The slaughter hogs were also "farm" assets because they were a part of the Knudsens' farming operation, which included the production of livestock. Thus, the slaughter hogs constitute "farm assets."

## 2. *Used in*

Section 1222(a)(2)(A) only applies if the debtor's farm assets are actually "used in" the farming operation. The phrase "used in" can be contrasted with the phrase "related to the farming operation," as found in § 101(18). "The phrase 'relating to' carries a 'broad' 'ordinary meaning,' i.e., ' 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with . . . .' '" *United States v. Weis*, 487 F.3d 1148, 1151 (8th Cir. 2007) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quoting *Black's Law Dictionary* 1158 (5th ed. 1979))). In contrast, "use" is defined as:

> [t]he application or employment of something; esp., a long-continued possession and employment of a thing for the purpose for which it is adapted, as distinguished from a possession and employment that is merely temporary or occasional <the neighbors complained to the city about the owner's use of the building as a dance club>.

*Black's Law Dictionary* 1540 (7th ed. 1999). Thus, the phrase "related to" appears to have a *broader* meaning than the phrase "used in"; as a result, "it would appear that § 1222(a)(2)(A) is more restrictive than § 101(18), (20), and (21)." McQueen & Williams, *supra*.

"The term 'used' is encountered throughout the Bankruptcy Code but may be found most prominently in § 363." *Id*. Section 363 concerns the "use, sale, or lease of property" of the estate both "in the ordinary course of business" and "other than in the ordinary course of business." Section 363(b)(1) provides when the trustee "may *use*, sell or lease, *other than in the ordinary course of business*, property of the estate," while § 363(c)(1) provides that

> [i]f the business of the debtor is authorized to be operated under section . . . 1203 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may *use property of the estate in the ordinary course of business* without notice or a hearing.

(Emphasis added.)

The language of § 363(c)(1)—"*use* property of the estate *in* the ordinary course of business"— is comparable to that of § 1222(a)(2)(A)—"the claim is a claim owed to a governmental unit that arises as a result of the sale . . . of any farm asset *used in the debtor's farming operations*." (Emphasis added.) The notable difference is that § 1222(a)(2)(A) is "farming specific, that is, the course of business that § 363 refers to in a Chapter 12 case where the debtor seeks the benefits of § 1222(a)(2)(A) is generally farming operations." McQueen & Williams, *supra*. Under "[l]ong-standing bankruptcy law and practice," a trustee or debtor-in-possession is entitled to, under § 363(c)(1), "use inventory or the proceeds from inventory, i.e., accounts receivable" in the ordinary course of business. McQueen & Williams, *supra*; *cf. Collier's on*

*Bankruptcy* ¶ 363.03[3][a] (15th ed. rev. 2008) ("[T]he trustee may sell inventory or collect accounts in the ordinary course of business without court approval, since these are not cash collateral, but the cash proceeds will be 'cash collateral,' even if acquired by the trustee after the commencement of the case, because the cash is proceeds of the inventory or receivables, unless the court orders otherwise under section 552(b)."). Given the substantial similarity between § 1222(a)(2)(A) and § 363(c), we see no reason why the phrase "used in" in § 1222(a)(2)(A) should not be afforded the same meaning as the similar phrase "use property of the estate in the ordinary course of business" in § 363(c)(1). As a result, the slaughter hogs, like inventory, would be considered "used in" the farming operation.

Here, the government supports its argument that the slaughter hogs are not "used in" the farming operation by reference to 26 U.S.C. § 1231 of the IRC. According to the government, like § 1222(a)(2)(a), § 1231 employs the word "used" in a phrase to designate certain property receiving beneficial treatment in the context of capital gains taxes. Section 1231(a) provides beneficial capital gains tax treatment for certain gain from the sale of "property used in the trade or business." Section 1231(b)(3)(B) provides that "livestock" includes "other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition." Thus, under § 1231, the products themselves, i.e., the "end products," of the business are not "used in the trade or business."

The government's analogy to § 1231 in interpreting § 1222(a)(2)(A) breaks down for three primary reasons. First, if we were to apply the government's interpretation of "used in," then, under § 363(c)(1), a trustee or debtor-in-possession could never "use" inventory because it is not "a deemed or defined capital asset." McQueen & Williams, *supra*. Additionally, § 1206 provides that "[a]fter notice and a hearing . . . the trustee [in a Chapter 12 case] may sell property under section 363(b) and (c) free and clear of any interest in such property of an entity other than the estate

-27-

if the property is *farmland [or] farm equipment . . . .*" (Emphasis added.) The wording of this section indicates that "when Congress wants to identify a debtor's rights and powers in deemed or defined capital assets only, such as farm land or farm equipment, it does so specifically." McQueen & Williams, *supra*.

Second, § 1222(a)(2)(a) is not a federal income tax provision found in the Bankruptcy Code; instead, it is a priority-stripping provision that applies to *any* tax claim—federal, state, or local. Therefore, we decline to apply the § 1231 of the IRC in the bankruptcy context and instead rely on the provisions of the Bankruptcy Code itself in interpreting § 1222(a)(2)(A). *See, e.g.*, *United States v. Reorganized CF& I Fabricators of Utah, Inc.*, 518 U.S. 213, 224 (1996) ("In sum, we conclude that the 1978 [Bankruptcy] Act reveals no congressional intent to reject generally the interpretive principle that characterizations in the Internal Revenue Code are not dispositive in the bankruptcy context, and no specific provision that would relieve us from making a functional examination of § 4971(a).").

Third, a commonsense understanding of the phrase "used in" supports the Knudsens' argument that the slaughter hogs were "used in" their farming operation. As noted *supra*, "use" means "to apply" or "to employ" something. *See Black's Law Dictionary* 1540 (7th ed. 1999). Here, the Knudsens certainly "employed" or "made use of" the slaughter hogs for their purposes. In the 1990s, the Knudsens operated a farrow-to-finish hog operation in which they would sell the hogs as their main source of income. And, prior to the bankruptcy filing, the Knudsens "used" the slaughter hogs in their farming operation by selling them in order to reorganize their farming operation in accordance with their contact with SPI.

### 3. *Debtor's Farming Operation*

There is no dispute that the Knudsens qualify as "debtors" under 11 U.S.C. §§ 101(13) and 109. "The term 'debtor' means person or municipality concerning which a case under this title has been commenced." 11 U.S.C. § 101(13). Under § 109,

"[o]nly a family farmer or family fisherman with regular annual income may be a debtor under chapter 12 of this title." The Knudsens are family farmers.

To understand the meaning of "farming operation," we look to 11 U.S.C. § 101(21). "The term 'farming operation' includes farming, tillage of the soil, dairy farming, ranching, production or raising of crops, poultry, or livestock, and production of poultry or livestock products in an unmanufactured state." 11 U.S.C. § 101(21). "[T]he above list is not all-inclusive," as it employs the term "includes." *Watford v. Fed. Land Bank of Columbia (In re Watford)*, 898 F.2d 1525, 1527 (11th Cir. 1990). "This definition is to be construed liberally in order to further Congress'[s] purpose of helping family farmers to continue farming." *Id.*

Here, the Knudsens engaged in a "farming operation," as they have operated a hog farm since the early 1990s. First, this "farming operation" consisted of farrow-to-finish hog production in which the Knudsens were selling their own hogs as their main source of income. Then, in 2004, the Knudsens "farm operation" changed from a farrow-to-finish hog operation to raising pigs under a contract with SPI.[3]

---

[3]In interpreting the meaning of "the debtor's farming operation," the district court stated:

> "[T]he debtor's farming operation" is broad enough to encompass both a farrow-to-finish hog operation, the Knudsens' original operation in and prior to 2004, and a custom hog-feeding operation, the Knudsens' reorganized operation, as both constitute "raising of . . . livestock."

*Knudsen*, 389 B.R. at 659. But the district court went further, finding that the use of the phrase "the plan shall provide" in § 1222 indicated that "farming operation" meant "*the farming operation under the reorganization plan*, not the farming operation as it existed before the farmer's attempt to reorganize." *Id.* But we find that the reference to "the plan shall provide" is only meant to explain what the debtors must provide to pay back their priority creditors; the debtors' Chapter 12 plan must fully pay all priority claims unless § 1222(a)(2)(A) is applicable. Nowhere in the language of

In summary, because we find that Knudsens' sale of their slaughter hogs qualifies for treatment under the plain language of § 1222(a)(2)(A), we reverse the bankruptcy court's judgment that the slaughter hogs were not a "farm asset used in the debtor's farming operation" under § 1222(a)(2)(A).

C. *Allocation of Tax Claims Entitled to Beneficial Treatment*

The government's final argument is that the "proration method"—as opposed to the Knudsens' preferred "marginal method"—is the appropriate method for allocating the Knudsens' 2004 tax liability. Some method must be used for allocating the Knudsens' 2004 tax liability between the tax arising out of the transactions within the scope of § 1222(a)(2)(A) and the tax arising from those transactions outside of its scope. The § 1222(a)(2)(A) portion would be an unsecured claim but the remainder would retain its priority status. The government points out that § 1222(a)(2)(A) is silent as to the proper allocation of tax liability, thereby requiring us to consult legislative history and the statutory purposes of Chapter 12 to determine the proper allocation method. According to the government, its allocation method, which divides the taxes proportionately between the two types of claims, gives effect to Congress's intent to balance the interests of debtors and creditors in Chapter 12.

The bankruptcy court adequately summarized the parties' competing positions as follows:

> IRS argues that the appropriate way to allocate the taxes is to prepare a tax return which recognizes total income and all deductions and exemptions and calculates the income tax based on all taxable income. IRS would then calculate the percentage of total income attributable to sales of qualifying capital assets and the percentage of total income attributable to non-qualifying sources. The income tax would be divided according to these percentages. See IRS exhibit A (applying this method

§ 1222(a)(2)(A) does it limit its application to only the "reorganized" operation.

-30-

to Knudsens' 1040X amended return for 2004). IRS would add the total self-employment tax to the tax for non-qualifying income because it says the self-employment tax is not based on income from the sale of capital assets. Knudsens' 2004 tax returns show this to be so (exhibits 1 and 64).

IRS would next subtract any credits according to their relation to the sources of income. In the case of its example for 2004, it applied two credits to the non-qualifying tax calculation (tax withheld and fuels credit). IRS arrives at a net tax due for each treatment and then calculates the percentage of the tax attributable to qualifying and non-qualifying sources of income. In exhibit A, the "priority claim" is 82 per cent of the total tax, and the unsecured "general claim" is 18 per cent. IRS would then apply any payments on taxes for 2004 in accordance with the percentage relationship of net tax due for qualifying and non-qualifying income, yielding a tax balance for each. IRS calls this method a proration or proportional method.

Knudsens argue for a marginal rate method. They would calculate a tax return for all income, and then a second, pro forma tax return removing all qualifying sales income. The Knudsens contend that this is a better method because it taxes the non-qualifying income at lower marginal tax rates. This results in a lower tax for income not entitled to beneficial treatment and likely makes reorganization more feasible, furthering the intent of the amendment. Knudsens would also apply any and all payments on taxes to the non-qualifying tax, the tax which would not be discharged unless paid. No tax payments for 2004 would be applied to the portion of the tax that would receive beneficial treatment as unsecured debt under § 1222(a)(2)(A).

\*\*\*

IRS otherwise objects to the marginal rate method for the very reason Knudsens support it—it calculates the remaining priority taxes at lower marginal rates. IRS argues for a method that taxes all taxable income at the marginal rates that would be applicable outside of bankruptcy and then prorates the result. Neither party provides any other argument for the proposal.

-31-

*Knudsen*, 356 B.R. at 486–87 (finding that "the proration method is the better method for determining what amount of tax qualifies for beneficial treatment under § 1222(a)(2)(A) and what does not" because "[i]t recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income" and "divides the actual tax without regard to which sales produced the last dollar of income").

Section 1222(a)(2)(A) is *silent* as to how a debtor's tax liability should be allocated between non-priority and priority claims. This silence is somewhat explainable by § 1222(a)(2)(A)'s priority-stripping nature. The provision does not relate solely to taxes but also to "a claim owed to a governmental unit." If a statute is silent, then such statute is deemed ambiguous. *See Clark v. U.S. Dep't of Agriculture*, 537 F.3d 934, 942 (8th Cir. 2008). "[A]mbiguities in the Code are generally resolved in favor of the debtor." *New Neighborhoods, Inc. v. W. Va. Workers' Comp. Fund*, 886 F.2d 714, 719 (4th Cir. 1989); *cf. Matter of Nickerson & Nickerson, Inc.*, 530 F.2d 811, 814 (8th Cir. 1976) (The referee reasoned that this ambiguity should be resolved in favor of the debtor, since excluding priority claims from the fee base would result in reducing the expenses incurred by the debtor and thus would foster the rehabilitative purposes of the Act.").

> [S]o long as [the creditor's right] is protected[,] the creditor certainly is in no position to insist that doubts or ambiguities in [an] Act be resolved in its favor and against the debtor. Rather the Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress . . . lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act.

*Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278–79 (1940) (internal citations omitted).

Additionally, once this court concludes that a particular statute is ambiguous, we may "'seek guidance in the statutory structure, relevant legislative history, [and] congressional purposes expressed in the statute.'" *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1243 (8th Cir. 2008) (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 737 (1985)) (alteration in *Villanueva-Sotelo*). The purpose of Chapter 12 is "to provide family farmers with a faster, simpler, and cheaper alternative to Chapter 11 and Chapter 13 procedures, while preserving the fair treatment of creditors under those chapters." *Rowley v. Yarnall*, 22 F.3d 190, 193 (8th Cir. 1994). It "was designed to 'give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land . . . while, at the same time, preventing abuse of the system and ensuring that farm lenders receive a fair repayment." *Id.* (quoting H.R. Conf. Rep. No. 958, 99th Cong., 2d Sess. 48 (1986), reprinted in 1986 U.S.C.C.A.N. 5227, 5249) (alteration in *Rowley*). Courts have recognized that "Chapter 12 was enacted as an emergency response to a then-existing farm debt crisis." *Travelers Ins. Co. v. Bullington*, 878 F.2d 354, 360 (11th Cir. 1989).

> "Congress intended the family farmer provisions to be novel, but short-lived. The statute by its terms expires after only seven years. 28 U.S.C. § 581 note. The short lifetime of Chapter 12 suited Congress' desire to 'evaluate both whether the chapter is serving its purpose and whether there is a continuing need for a special chapter for the family farmer.' H.R. Conf. R. at 48, USCCAN at 5249. Common sense suggests Congress was mindful of the farmer' existing loans when it set the seven year limitation."

*Id.* (quoting *Dahlke v. Doering*, 94 B.R. 569 (D. Minn. 1989)); *see also In re Sohrakoff*, 85 B.R. 848, 849 (Bankr. E.D. Cal. 1998) ("[C]hapter 12 was enacted for those farmers who want to keep their land and continue to farm."); *In re McCann*, 202 B.R. 824, 826 (Bankr. N.D. N.Y. 1986) ("Chapter 12 was enacted in 1986 and was modeled after the existing chapter 13. Congress recognized the financial problems farmers were encountering in the 1980s as well as their difficulties in complying with

the requirements of Chapters 11 and 13 and crossbred them resulting in the birth of Chapter 12.").[4]

---

[4]The Supreme Court has recently held that, with regard to *Chapter 11*, as opposed to Chapter 12:

> Nor are we persuaded that in this case we should construe § 1146(a) "liberally" to serve its ostensibly "remedial" purpose. Based on the Eleventh Circuit's declaration that the Bankruptcy Code is a "remedial statute," Piccadilly would stretch the disallowance well beyond what the statutory text can naturally bear. Apart from the opinion below, however, the only authority Piccadilly offers is a 1952 decision of this Court interpreting the Shipping Commissioners Act of 1872. See Brief for Respondent 54 (citing *Isbrandtsen*, *supra*, at 782, 72 S. Ct. 1011). But unlike the statutory scheme in *Isbrandtsen*, which was "'designed to secure the comfort and health of seamen aboard ship, hospitalization at home and care abroad,'" 343 U.S., at 784, 72 S. Ct. 1011 (quoting *Aguilar v. Standard Oil Co. of N. J.*, 318 U.S. 724, 728, 63 S. Ct. 930, 87 L. Ed. 1107 (1943)), the Bankruptcy Code—and Chapter 11 in particular—is not a remedial statute in that sense. To the contrary, this Court has rejected the notion that "Congress had a single purpose in enacting Chapter 11." *Toibb v. Radloff*, 501 U.S. 157, 163, 111 S .Ct. 2197, 115 L. Ed.2d 145 (1991). Rather, Chapter 11 strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate. *Ibid*. The Code also accommodates the interests of the States in regulating property transfers by "'generally [leaving] the determination of property rights in the assets of a bankrupt's estate to state law.'" *Travelers Casualty & Surety Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, ____, 127 S. Ct. 1199, 1205, 167 L. Ed.2d 178 (2007). Such interests often do not coincide, and in this case, they clearly do not. We therefore decline to construe the exemption granted by § 1146(a) to the detriment of the State.

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326, 2338–39 (2008).

Moreover, the "the IRS does not always apply the proportional method." *Ficken v. Internal Revenue Serv. (In re Ficken)*, Case No. 05-52940-HRT, Adversary No. 08-01687-HRT, slip opn. at 14 (Bankr. D. Colo. July 30, 2009) (unpublished). "Although the observation that [the] IRS does not always use the proportional method when allocating the tax is not determinative, it does illustrate some exceptions where the IRS does not apply what would be the proportional method to treat each dollar of income as the same." *Id*. For example, [t]he IRS utilizes the marginal method to determine estate taxes for special use valuation under 26 U.S.C. § 2032A." *Id*. "[T]he estate tax, like the income tax, is a graduated tax." *Id*. Pursuant to § 2032A, farmland may be passed "from one generation to the next by a 'qualified heir.' [The] IRS requires the estate to report only the Special Use Value, and not the Fair Market Value, on Form 706 to determine the estate tax due." *Id*.

And, the IRS "requires computation of [tax on prior transfers (TPT)] using the marginal method" under I.R.C. § 2013. *Id*. (citing Robert J. Stommel & Lester B. Law, *Planning to Maximize the § 2013 Credit*, 72 Fla. Bar J. 66 (1998)).

> "[T]he TPT credit is a credit applied to the federal (and not state) estate tax liability of the decedent's estate equal to the amount of the federal estate tax deemed paid on property transferred to the decedent from the transferor." [Stommel & Lester] at 66. The tax is the amount of federal estate tax attributable to the transferred property in the decedent's estate. The tax is computed as the lesser of the "average" or "pro rata" method of tax allocation and the "with and without" or "marginal" method of tax allocation. *Id*. at 69. With respect to TPT, [the] IRS contemplates that the taxpayer compute the tax under the marginal method, and if the marginal method results in a lower tax than the "pro rata" or proportional method, that is the tax to be paid.

*Id*.

We hold that the proper allocation method under § 1222(a)(2)(A)—a priority-stripping provision as opposed to a tax provision—is the "marginal method." As the district court observed:

> By treating the proceeds of transactions that qualify for beneficial treatment under § 1222(a)(2)(A), in effect, as the "last dollars in," and, therefore, subject to the highest marginal tax rate, the "marginal method" maximizes the percentage of the taxes to which beneficial (unsecured) treatment will apply, reducing the IRS's "veto" power, and making the debtors' reorganization plan more feasible and, hence, more confirmable. The IRS's method, in contrast, would minimize the taxes entitled to beneficial treatment and reinstate much of the IRS's "veto" power, thereby "fritter[ing] away" the benefits of § 1222(a)(2)(A) in stripping priority from "claims" of "governmental units," at least to the extent that such "claims" are tax claims. *See Wright*, 311 U.S. at 279, 61 S. Ct. 196 (J. Douglas) (observing that "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and letter of the Act"). The Knudsens' approach does not, however, entirely eliminate the IRS's "veto" power, which, consistent with the plain language of § 1222(a)(2)(A), *see B & D Land & Livestock Co.*, 332 F. Supp. 2d at 1210 (the first approach to statutory interpretation is the "plain language" of the statute in question); *accord In re Hen House Interstate*, Inc., 177 F.3d at 722 (interpretation of provisions of the Bankruptcy Code begins with the plain meaning of the statute); *In re Martin*, 140 F.3d at 807–08 (same), remains in place to the extent that the family farmer's reorganization plan does not provide for the payment of the priority portion of the claim or the family farmer still fails to obtain a discharge under the reorganization plan. *See* 11 U.S.C. § 1222(a)(2) (subject to the exception § 1222(a)(2)(A), the plan must provide for payment of priority claims, and the claims subject to the exception are only treated as unsecured "if the debtor receives a discharge").
>
> Therefore, the "marginal method" is the correct method to determine the allocation of taxes between priority and non-priority claims. To apply

that method, the Knudsens should calculate a return for all income, then a second "pro forma" tax return removing all qualifying sales income, so that non-qualifying income would be taxed at lower marginal tax rates, and the taxes shown on the "pro forma" return would represent the portion of the tax claim entitled to priority status, while the difference between the taxes shown on the return for all income and the taxes shown on the "pro forma" return would represent the unsecured portion of the tax claim.

*Knudsen*, 389 B.R. at 668–69.

Therefore, we reverse and remand the portion of the bankruptcy court's judgment choosing the "proration method" instead of the "marginal method."

### III. *Conclusion*

Accordingly, we affirm the judgment of the bankruptcy court in No. 08-3627.

In No. 08-2820, we affirm in part and reverse in part the judgment of the bankruptcy court. First, we reverse the part of the bankruptcy court's decision holding that the Knudsens' prepetition sale of their slaughter hogs in 2004 is not entitled to the benefit of 11 U.S.C. § 1222(a)(2)(A). Second, we reverse the part of the bankruptcy court's decision holding that the "proration method" is the correct method to determine the allocation of taxes between priority and non-priority claims, as opposed to the "marginal method." Finally, we affirm the part of the bankruptcy court's decision holding that a Chapter 12 debtor may treat postpetition income taxes imposed on the debtor's income earned during the pendency of the case as administrative expenses under 11 U.S.C. § 503. We remand to the bankruptcy court with instructions to confirm the Knudsens' Fifth Amended and Substituted Plan of Reorganization in accordance with this opinion.

-37-

COLLOTON, Circuit Judge, concurring in the judgment in part and dissenting in part.

These appeals raise complex questions concerning the application of 11 U.S.C. § 1222(a)(2)(A). My analysis of the three principal issues differs in some respects from the majority opinion.

I.

The first principal issue is whether § 1222(a)(2)(A) applies to transactions occurring after the filing of a bankruptcy petition. There are plausible arguments on both sides of this question, but with one exception, I agree with the majority's rationale and its conclusion that the statute does apply to the post-petition sale of farm assets used in the debtor's farming operation.

The exception is the issue of sovereign immunity. Where a waiver of sovereign immunity is required, it must be "unequivocally expressed." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 34 (1992) (internal quotation omitted). The government's consent to be sued must be "construed strictly in favor of the sovereign," and not "enlarged . . . beyond what the language requires." *Id.* (internal quotations omitted). Where there are two plausible readings of a statute, one of which imposes monetary liability on the government and another which does not, then there is no "unambiguous" waiver of sovereign immunity, and a court should adopt the reading that favors the sovereign. *Id.* at 37.

If a waiver of sovereign immunity is required for confirmation of the Chapter 12 plans in these cases, then I doubt that the majority's rationale is sufficient to establish a clear waiver. Section 1222(a)(2)(A) itself (which is not among the sections as to which Congress expressly waived sovereign immunity in 11 U.S.C. § 106), and the waiver of sovereign immunity with respect to administrative expenses under 11 U.S.C. § 503(b) (which is said to waive immunity under § 1222(a)(2)(A) through a

-38-

three-step process involving references to 11 U.S.C. § 507, *ante*, at 18), are not the sort of unequivocal expressions that are demanded by Supreme Court precedent. Section 1222(a)(2)(A) is at least plausibly "susceptible of another construction," *Nordic Village*, 503 U.S. 36, namely, that it applies only to pre-petition claims, and the statutes lack the necessary clarity to effect a valid waiver of sovereign immunity.[5]

As I read the Supreme Court's most recent discussion of sovereign immunity in the bankruptcy context, however, no waiver of immunity is required for confirmation of the Chapter 12 plans in these cases. "Bankruptcy jurisdiction, as understood today and at the time of the framing, is principally *in rem* jurisdiction." *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 369 (2006). The bankruptcy court's jurisdiction typically "is premised on the debtor and his estate, and not on the creditors." *Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440, 447 (2004). The court's *in rem* jurisdiction "permits it to determine all claims that anyone, whether named in the action or not, has to the property or thing in question." *Id.* at 448. On this understanding, the Supreme Court held neither a bankruptcy court's discharge of a student loan debt, *id.* at 450, nor a proceeding to avoid alleged preferential transfers by a debtor to a state agency, *Katz*, 546 U.S. at 371-72, implicated a State's sovereign immunity under the Eleventh Amendment. The confirmation of a Chapter 12 plan,

---

[5]Also problematic is the majority's statement, based on *dicta* in a footnote in *Rose v. U.S. Department of Education* (*In re Rose*), 187 F.3d 926, 930 n.7 (8th Cir. 1999), that the government's belated assertion of sovereign immunity is a "factor" that may be "relevant to the issue of waiver." *Ante*, at 16. Sovereign immunity is a jurisdictional issue that may be raised at any time, *Jones v. United States*, 255 F.3d 507, 511 (8th Cir. 2001); *United States v. Johnson*, 853 F.2d 619, 622 n.7 (8th Cir. 1988), and negligence by an attorney for the government cannot accomplish a waiver, because "[n]o officer by his action can confer jurisdiction." *United States v. Shaw*, 309 U.S. 495, 501 (1940). When deciding question of sovereign immunity, we consider whether the government has given "specific statutory consent," *id.* at 500, and the answer does not change from case to case depending on whether counsel for the government timely asserted the point.

with its attendant decisions about the priority status of various claims in bankruptcy, similarly proceeds under the bankruptcy court's *in rem* jurisdiction over the bankruptcy estate.

*Hood* and *Katz* involved *state* sovereign immunity under the Eleventh Amendment, but the Supreme Court's treatment of *in rem* jurisdiction and federal sovereign immunity suggests no different result with respect to the interests of the United States in a bankruptcy proceeding. The Court has looked to admiralty law when considering the relationship between *in rem* jurisdiction and sovereign immunity in bankruptcy. *See Hood*, 541 U.S. at 441 ("Although bankruptcy and admiralty are specialized areas of the law, there is no reason why the exercise of federal courts' *in rem* bankruptcy jurisdiction is more threatening to state sovereignty than the exercise of their *in rem* admiralty jurisdiction."). When discussing *in rem* jurisdiction over admiralty actions, the Court has acknowledged no distinction between the immunity of federal and state sovereigns. *See California v. Deep Sea Research, Inc.*, 523 U.S. 491, 506-07 ("In considering whether the Eleventh Amendment applies where the State asserts a claim in admiralty to a *res* not in its possession, this Court's decisions in cases involving the sovereign immunity of the Federal Government in *in rem* admiralty actions provide guidance, for this Court has recognized a correlation between sovereign immunity principles applicable to States and the Federal Government."); *Tindal v. Wesley*, 167 U.S. 204, 213 (1897) ("[I]t cannot be doubted that the question whether a particular suit is one against the state, within the meaning of the constitution, must depend upon the same principles that determine whether a particular suit is one against the United States."). Striking a theme similar to *Hood* and *Katz*, the Court held that an *in rem* proceeding in admiralty to enforce a lien against the United States does not offend sovereign immunity as long as the government's actual possession of property is not invaded under process of the court. *See The Davis*, 77 U.S. 15, 19-21 (1869).

Based on these authorities, I conclude that the bankruptcy court's exercise of *in rem* jurisdiction to approve a Chapter 12 plan is not an affront to the sovereign immunity of the United States. Therefore, sovereign immunity does not preclude the application of § 1222(a)(2)(A) to post-petition transactions. Because I agree with the court that § 1222(a)(2)(A) does apply to post-petition sales of farm assets used in the debtor's farming operation, I concur in the judgment in the *Schilke* case.

## II.

The second principal issue is whether § 1222(a)(2)(A) applies to the sale of slaughter hogs by the Knudsens in 2004. The statute provides that a Chapter 12 plan need not provide for full payment of a claim that "arises as a result of the sale . . . of any farm asset used in the debtor's farming operation." The bankruptcy court concluded that the government's claim for taxes due as a result of the sale of the Knudsen's slaughter hogs did not fit within this exception, *see In re Knudsen*, 356 B.R. 480, 485-86 (Bankr. N.D. Iowa 2006), and I would affirm this conclusion.

The statute defines "farming operation" to include the "raising of crops, poultry, or livestock." 11 U.S.C. § 101(21). As of 2004, the Knudsens were involved in this sort of farming operation. They raised livestock and sold them for slaughter. The slaughter hogs, therefore, were assets *produced by* the farming operation, not assets *used in* the livestock-raising operation. That the slaughter hogs were sold to produce income (or, at a later date, to facilitate a reorganization of the farming operation) does not mean that they were "used in" the farming operation. The statute refers to claims arising as a result of *the sale* of an asset that was *already used* in the farming operation. The sale itself cannot be the use. With respect, the majority's analysis, adopted largely from a treatise on bankruptcy practice, overlooks this textual requirement. *See ante*, at 28 (concluding that "the Knudsens 'used' the slaughter hogs in their farming operation *by selling them* in order to reorganize their farming operation" and by "*sell[ing] the hogs* as their main source of income") (emphasis

added); C. Richard McQueen & Jack F. Williams, *Tax Aspects of Bankruptcy Law and Practice* § 14:9 (3d ed. 2009) ("In this case, the debtors intended *to use the sale* of the slaughter hogs . . . in the debtors' farm operations as contemplated in their business plan and as ultimately embodied in their Chapter 12 plan.") (emphasis added).

Beyond this textual problem with the majority's conclusion, I see no flaw in the bankruptcy court consideration of § 1222(a)(2)(A) *in pari materia* with the capital gains provision of 26 U.S.C. § 1231(b), which indicates that beneficial capital-gain tax treatment is limited to breeding livestock. The Knudsens and the majority acknowledge, even highlight, that a principal purpose of § 1222(a)(2)(A) was to address the treatment of a debtor's capital gains taxes. In that context, the analysis of §1222(a)(2)(A) is better informed by the closely related provision of the Internal Revenue Code than by a provision of the bankruptcy code, 11 U.S.C. § 363, that operates in a different context and has no relation to tax claims (or any other claims of governmental units) arising from the sale of assets.

It is common ground that the breeding sows and farm equipment sold by the Knudsens in 2004 qualify for preferential treatment under § 1222(a)(2)(A). I would affirm the bankruptcy court's conclusion, however, that § 1222(a)(2)(A) does not apply to the sale of the Knudsens' slaughter hogs in 2004.

III.

The third principal issue is whether the "proration method" or the "marginal method" should be used to allocate the Knudsens' tax liability for 2004. I would affirm the bankruptcy court's decision to apply the proration method.

The bankruptcy court adopted the proration method, observing that it (1) "recognizes all income, deductions, exemptions, and credits in arriving at a tax and allocates according to the percentage of each type of income," and (2) "divides the actual tax without regard to which sales produced the last dollar of income." *Knudsen*, 356 B.R. at 487. The district court agreed with these points, and acknowledged that "as a matter of *tax* policy, and from a *tax* perspective, the 'proration method' is appealing," *In re Knudsen*, 389 B.R. 643, 667 (N.D. Iowa 2008), but then reasoned that § 1222(a)(2)(A) applies to government claims other than tax claims, and adopted the marginal method because "ambiguous provisions must be resolved in favor of the debtor" in bankruptcy. *Id.* at 668.

The majority notes that the IRS does not always apply the proportional method, and that it sometimes applies the marginal method. But in explaining why it adopts the marginal method *in this situation*, the court reverts to the district court's view that the Bankruptcy Code must be "liberally construed" in favor of the debtor. *Ante*, at 36. This proposition is traced to Justice Douglas's opinion in *Wright v. Union Central Life Insurance Co.*, 311 U.S. 273 (1940), which observed that "the [Bankruptcy] Act must be liberally construed to give the debtor the full measure of the relief afforded by Congress, lest its benefits be frittered away by narrow formalistic interpretations which disregard the spirit and the letter of the Act." *Id.* at 279 (internal citation omitted).

The bankruptcy court's adoption of the proration method did not involve a "formalistic interpretation" of the Bankruptcy Code, but rather an effort to strike an

appropriate balance between the competing interests in bankruptcy on a matter about which the Code is silent. The more general proposition that ambiguous bankruptcy provisions must always be construed in favor of the debtor – if it ever held sway with the Supreme Court – is outmoded in light of the modern Bankruptcy Code and the Court's discussion in *Florida Department of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008). There, the Court rejected the Eleventh Circuit's declaration that the Bankruptcy Code is a "remedial statute" that should be construed "liberally" in favor of debtors. *Id*. at 2338. The Court explained that "*the Bankruptcy Code – and Chapter 11 in particular – is not a remedial statute in that sense*." *Id.* (emphasis added). Chapter 11, for example, "strikes a balance between a debtor's interest in reorganizing and restructuring its debts and the creditors' interest in maximizing the value of the bankruptcy estate." *Id.* at 2339. This court has concluded that Congress did not intend to depart from the "general purposes of bankruptcy law when creating an expeditious avenue for farm reorganizations" in Chapter 12. *Rowley v. Yarnall*, 22 F.3d 190, 193 (8th Cir. 1994).

The bankruptcy court's adoption of the proration method best strikes a balance between the farm debtor's interest in reorganizing his debts and the government's interest in satisfying tax obligations. The marginal method, by contrast, is a one-sided approach that tilts in favor of the debtor by disproportionately reducing the amount of tax unrelated to the sale of farm assets that is entitled to priority treatment. That the proration method makes sense as a matter of tax policy, moreover, is hardly insignificant. The Knudsens and the majority stress that § 1222(a)(2)(A) was adopted primarily to address the treatment of capital gains taxes owed by farmers in the process of reorganization, and it is sensible to adopt an allocation method that accommodates the competing interests involved in resolving the debtors' tax liability.

\*    \*    \*

For these reasons, I concur in the judgment in No. 08-3627, *United States v. Schilke*, affirming the decision of the bankruptcy court.  I dissent from the judgment in No. 08-2820, *Knudsen v. Internal Revenue Service*, and would affirm the decision of the bankruptcy court in that case as well.

_____